Caroline BURNEY, Plaintiff,

v.

RHEEM MANUFACTURING CO., INC., Defendant.

Civ.A. No. 97–W–1300–N.

United States District Court,
M.D. Alabama,
Northern Division.

Feb. 16, 2000.

Jimmy L. DeBardelaben, Dorothy Norwood, Montgomery, AL, for plaintiff.

Henry Clay Barnett, Jr., Barbara J. Gilbert, Christopher Weller, Montgomery, AL, for defendant.

## MEMORANDUM OF OPINION

WALKER, United States Magistrate Judge.

Plaintiff Caroline Burney filed the present action against Rheem Manufacturing Co., Inc. ("Rheem") on August 27, 1997, pursuant to Title VII of the Civil Rights Act of 1964, as amended, alleging that she was subjected to sexual harassment and discrimination on the basis of her sex with regard to "promotions, job assignments, initial hirings, benefits and other terms and conditions of employment." (Complaint, ¶ 7).[1] This action is presently before the court on the motion for summary judgment filed by defendant on January 16, 1998. Defendant contends that it is entitled to summary judgment on all of plaintiff's claims. Upon consideration of the parties' briefs, the evidentiary materials[2] and the pleadings in this case, the court concludes that the motion is due to be granted in part and denied in part.

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the

1. On December 17, 1997, plaintiff amended her complaint to include a claim of *quid pro quo* sexual harassment concerning Rheem employee Jerry Colburn. By order entered June 30, 1999, the court dismissed this claim because of plaintiff's failure to exhaust her administrative remedies. (Doc. # 101).

2. The court notes that both parties have filed documentary evidence which may be objectionable as lacking a proper evidentiary foundation or as being inadmissible on some other basis. As to evidence to which the parties have stated no objection, the court considers any objections that could have been made to be waived for purposes of this motion. *Davis v. Howard*, 561 F.2d 565, 570 (5th Cir.1977). As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992). The court notes that some of the evidence cited by the parties was not filed with the court on the summary judgment motion. For example, Plaintiff's Exhibit 5 includes no pages between 1 and 253; Exhibit 7 includes only pages 24, 185 and 186; Exhibit 8 does not includes pages 336 and 584; the Mid–Year Review is not behind Tab E as indicated by plaintiff; the Runo Anderson contract is not attached to plaintiff's supplemental affidavit, and in Defendant's Exhibit ZZ, there is no resume attached to Martin's affidavit.

court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir.1993). In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

> {W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue ... Rule 56(e) ... requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial... We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.... Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves...."

*Id.* at 324, 106 S.Ct. 2548.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Matsushita Electrical Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528 (11th Cir.

1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933–34 (11th Cir.1989) (citation omitted).

## DISCUSSION

### Promotion Claims

Defendant argues that it is entitled to summary judgment on plaintiff's claim that she was discriminatorily denied promotions because plaintiff cannot establish a *prima facie* case of discrimination; defendant has articulated legitimate, non-discriminatory reasons for its decision not to promote plaintiff; and plaintiff cannot demonstrate pretext. Plaintiff argues that she has presented direct and statistical evidence of discrimination. She further argues that she has established a *prima facie* case of discrimination and that she has produced evidence of pretext with regard to defendant's promotion decisions.

Rheem hired Burney on January 11, 1993 as an Assistant Sales Promotion Manager in the advertising section of its marketing department. (Defendant's Exhibit G). Her responsibilities included coordinating trade shows, developing sales promotions and literature, and acting as the liaison between the printer and the marketing staff regarding product literature. (Burney depo., p. 116). Burney received annual pay raises in 1994, 1995 and 1996. (Defendant's Exhibit G).

### *Sales Promotion Manager*

Andrew Krantz was in charge of the advertising section and supervised plaintiff throughout her employment with Rheem. (Defendant's Exhibit 15, Martin statement,

¶¶ 4–5)[3]. In 1994, Krantz was promoted from Sales Promotion Manager to the position of National Advertising Manager.[4] Rheem hired Scott Martin as Director of Marketing in December 1995. As Director of Marketing, Martin supervises seven managers, including Krantz. (Martin statement, ¶¶ 1, 4).

Shortly after he was hired, Martin met individually with employees in the Marketing Department. (Martin statement, ¶ 6). During the meeting with Burney, Burney told Martin that she should be the Sales Promotion Manager, that she had not been promoted solely because of sex discrimination, and that women do not get promoted. (Burney depo., pp. 161–62; Martin depo., p. 307). Martin responded that Burney need not be concerned because those conditions would not exist under his leadership. (Martin statement, ¶ 7).

At some point after Martin was hired, Burney asked Krantz for the Sales Promotion Manager position. Krantz told her that he could not make that decision and that he would have to speak with Martin about it. (Burney depo., pp. 805–06). Krantz told Martin that Burney was interested in more responsibility and a promotion. (Martin statement, ¶ 9). Martin and Krantz agreed to set several goals or "initiatives" for Burney to demonstrate that she was ready for a promotion, including developing a measurement system for tracking the financial benefit to Rheem of a given sales promotion, training in sales promotions, more involvement in keeping product literature up to date and in sufficient quantities, and improvement in her attention to detail and communications with co-workers. (Martin statement, ¶¶ 10–11). Krantz told Burney that if she accomplished all of these initiatives, she might be promoted to sales promotion manager. Burney objected, telling Krantz that she was doing all of the sales promotion manager

work successfully. Burney complained to Martin about not having the Sales Promotion Manager position. Martin told her that she had to complete the initiatives and sales promotions training by the end of the second quarter of 1996. (Burney depo., pp. 806–11, 814; Martin statement, ¶¶ 9–12). Plaintiff was not aware of anyone else in the company who was required to complete initiatives and training as a prerequisite to promotion. (Burney depo., p. 831–32).

### Assistant Residential Product Manager

On February 13, 1996, Rheem posted a vacancy announcement for a new position, Assistant Residential Product Manager. (Defendant's Exhibit 17, Miller aff. ¶¶ 2, 3; Defendant's Exhibit 7, Blanz aff., ¶ 5). At the time, Burney was in Atlanta at a trade show. Krantz called her and told her about the vacancy announcement. He told her that the position appeared to be "just up [her] alley" and asked if she were interested in it. Burney asked Krantz to find out whether the position would involve a promotion or a lateral move. She asked Krantz to submit her application for the job, because she would not return from Atlanta within the three-day posting period. Krantz agreed to submit the application, and did so. (Burney depo., pp. 836–39). After Burney returned from Atlanta, she learned from John Blanz, the Division Director of Human Resources, that the position would be a substantial promotion for plaintiff. (*Id.*; Blanz aff, ¶ 1).

Nineteen people applied for the position—ten applicants were male, and nine were female. (Blanz aff., ¶ 5). Rick Miller rejected all of the applicants and instead offered the position to Alan Cape, who had not applied for the position. Cape accepted the position, which was a lateral move for him. (Miller aff., ¶ 7). Miller did not interview Burney, but came into her office and told her

3. This exhibit is a signed statement by Scott Martin. It is not notarized, and is not a declaration under penalty of perjury. Plaintiff has not objected to the court's consideration of this exhibit, however, so the court considers any such objection waived.

4. Martin states, and some of defendant's documentation reflects, that Krantz' new title was

National Advertising and Sales Promotion Manager. (*See* Defendant's Exhibit 15, p. 6 and attachments 4 and 5). However, Krantz told plaintiff that he was the National Advertising Manager (plaintiff's deposition, p. 812), and defendant's organizational chart reflects the title of National Advertising Manager. (*See* attachment 2 to Defendant's Exhibit 15).

that she did not have enough experience for the job. (Burney depo., p. 841). Burney told a co-worker, Patty McKenzie, that she was not seriously interested in the position. (Defendant's Exhibit 3, McKenzie aff., p. 2).[5] She told another co-worker, Judith Huntsberry, that she was "extremely interested" in the position. (Burney supplemental aff., ¶ 9).

### Analytical Framework

In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence. The analytical framework and burden of production varies depending on the method of proof chosen. If a plaintiff can provide direct evidence of discriminatory intent, then the employer must prove by a preponderance of the evidence that the same employment decision would have been made in the absence of the discriminatory intent.

\* \* \* \* \* \*

Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption. Therefore, remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.

*Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted).

The *McDonnell Douglas/Burdine* framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination where there is no direct evidence of discrimination. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1527–28 (11th Cir.1997). The plaintiff must first make out a *prima facie* case of discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 at 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207; *Walker v. Mortham*, 158

F.3d 1177, 1183 (11th Cir.1998); *Combs*, 106 F.3d at 1527–28. "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." *Id.* (quoting *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089); *Walker, supra.*

If the plaintiff establishes a *prima facie* case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action." *Combs*, 106 F.3d at 1528 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668). "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 257, 101 S.Ct. 1089). If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the *prima facie* case is destroyed. *Walker*, 158 F.3d at 1184. The plaintiff must then produce evidence "including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs*, 106 F.3d at 1528.

Defendant contends that it is entitled to summary judgment as to plaintiff's claim regarding the "Sales Promotion Manager" position because there was no vacancy created by Krantz' promotion and no one, male or female, was promoted to Sales Promotion Manager—and, therefore, plaintiff cannot establish a *prima facie* case of discrimination.

---

5. Citing McKenzie's affidavit and the affidavit of Judith Huntsberry, defendant argues that Krantz contacted plaintiff about the position "without any knowledge of the fact that Plaintiff had already expressed to a colleague that she was not interested in the position." (Defendant's Brief, p. 39). However, neither affidavit cited by defendant states that plaintiff expressed this sentiment at any time before she applied for the position. Additionally, in view of plaintiff's supplemental affidavit to the contrary, the court cannot accept Huntsberry's statement that plaintiff told her she was not interested in the position as true for purposes of summary judgment. (*See* Defendant's Exhibit 1, Huntsberry aff., p. 2; Burney supplemental aff., ¶ 9).

(Defendant's Brief, pp. 37–38, 59–60; Defendant's reply brief, p. 4). With regard to the Assistant Residential Products Manager, defendant argues that plaintiff cannot establish a *prima facie* case because: (1) plaintiff was not actually interested in the position and cannot establish that she applied for the position; (2) Miller, the selecting official, determined that plaintiff was unqualified; and (3) the selectee, Alan Cape, was far more qualified than plaintiff. (Defendant's Brief, pp. 38–43, 60–62). With regard to both positions, defendant further argues that it has articulated a legitimate, non-discriminatory reason for its failure to promote plaintiff, and that plaintiff cannot establish pretext. (Defendant's Brief, pp. 62–63).

Plaintiff responds that there was, in fact, a vacancy for Sales Promotion Manager to which she could have been promoted and that, even if there were no vacancy, Martin and Krantz still had the option of promoting her. (Plaintiff's Brief, pp. 51–54). With regard to the Assistant Residential Products Manager position, plaintiff argues that she was qualified for the position according to the vacancy announcement, and that the selectee was not as qualified as plaintiff. (*Id.*, pp. 54–55). Plaintiff contends that she has produced direct evidence of discrimination with regard to these promotions, and that she has established a *prima facie* case of discrimination as to these promotions by statistical evidence. She further argues that she has established a *prima facie* case of discrimination under the *McDonnell–Douglas/Burdine* framework, and that she has produced evidence of pretext. (Plaintiff's Brief, pp. 56–63).

### Direct Evidence

Plaintiff contends that she has presented direct evidence of discrimination as to her promotion claims in the form of: (1) an affidavit from Joe Dykstra, a former regional sales manager for Rheem, in which Dykstra states that Rheem would always choose a man over a woman or minority for management positions; (2) plaintiff's testimony that she heard Rheem's District Sales Manager, Mark Adams, state to Gary McKay, also a District Sales Manager, that the only way to handle sexual harassment problems is not to hire women; and (3) a reference by Martin to some jobs as not being "sexy." (Plaintiff's Brief, pp. 56–57; Plaintiff's surreply brief, p. 10).

During her deposition, plaintiff testified as follows:

A. During the Saturday of the Southern Pipe & Supply Company outing, I was on a pontoon boat with Mark Adams and, I believe, Gary McKay. And I don't know who else was on the pontoon boat. But they were discussing—apparently there was some kind of Southern Pipe sexual harassment problem or potential suit.

\* \* \* \* \* \*

A. Anyway, they were discussing in front of me—I did not take part in the discussion, but I was sitting right there in the pontoon boat—a sexual harassment problem at a branch of Southern Pipe. And the manager, who Mark Adams handled his account, asked for Mark Adams' advice on how to handle it. And Mark Adams said, I told him that the only way you can avoid having any kind of sexual harassment problems is to not hire women and to keep them out of this industry.

(Burney depo., pp. 801–03).

Neither Adams nor McKay made decisions with regard to either the Assistant Residential Products Manager position or the Sales Promotion Manager position. (Miller aff., ¶¶ 7–9; Blanz supplemental aff., ¶ 3). Adams' remark to McKay does not have any connection with the decisionmakers for those positions. Further, the remark is completely unrelated to the decisionmaking process for the positions at issue and, thus, does not constitute direct evidence of discrimination. *Standard, supra,* 161 F.3d at 1330 ("Remarks by non-decisionmakers or unrelated to the decisionmaking process itself are not direct evidence of discrimination.")(citing *EEOC v. Alton Packaging Corp.,* 901 F.2d 920, 924 (11th Cir.1990)); see also *Berman v. Orkin Exterminating Company, Inc.,* 160 F.3d 697 (11th Cir.1998)("A statement by a person who played no part in the adverse personnel decision is not direct evidence of discrimination.") (citation omitted).

In his affidavit (Plaintiff's Exhibit J), Dykstra states:

> Ms. Burney complained on numerous occasions about the discriminatory manner in which she was being treated by Rheem's all-male management team. I told Ms. Burney that I understood her plight but that the was nothing really I could do given Rheem's "good ole boy" mentality. In my 20 plus years of being around Rheem, upper management at Rheem would always choose a man over a woman or a minority for a management position.

(Dykstra aff., ¶ 6). This generalization by Dykstra, even if true, likewise does not provide direct evidence of discrimination. As noted above, "direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard, supra*, 161 F.3d at 1330. Dykstra's conclusory statement that "upper management ... would always choose a man over a woman" falls far short of this mark. *See Miller v. Citizens Security Group, Inc.*, 116 F.3d 343, 346 (8th Cir.1997)("A conclusory statement in an affidavit ... cannot create a genuine issue of material fact which precludes summary judgment.").

In her supplemental affidavit, Burney states that during her December 1995 meeting with Martin, "[Martin] asked me if I would be interested in working in areas outside of Marketing including Sales, the Plant, Credit, etc. I reiterated my interest in being promoted, whether it was in marketing or elsewhere in the company. Scott Martin's reply to this *was "well, a lot of these jobs aren't sexy jobs."* (Burney supplemental aff., ¶ 8)(emphasis in original). By presenting this as "direct evidence," plaintiff apparently contends that this statement establishes Martin's discriminatory intent with regard to the Sales Promotion Manager position "without any inference or presumption." *Standard, supra.* The court disagrees. To find this statement probative of discriminatory motivation, one would first have to infer that Martin intended to convey some kind of sexual meaning by his description of the jobs as not "sexy." "Sexy" used in connection with describing a job has a common connotation of attractive or interesting, as opposed to unappealing. Martin's statement, while perhaps unprofessional, is not direct evidence of discrimination.

*Statistical Evidence.*

Plaintiff contends that "in a proper case, statistical patterns alone can constitute prima facie proof of a pattern or practice of discrimination." (Plaintiff's Brief, p. 57). She asserts that she has presented statistical evidence sufficient to overcome defendant's motion for summary judgment. Defendant argues that, in a case of individual disparate treatment, a plaintiff may not establish a *prima facie* case of discrimination through statistics alone. (Defendant's reply brief, p. 14).

It is clear that in a class action lawsuit alleging discrimination, "statistics alone may be enough to create a prima facie case of classwide discrimination." *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1131 (11th Cir.1984). It is also clear that a plaintiff may establish a *prima facie* case of disparate impact by identifying a specific employment practice that allegedly has a disproportionate impact and then "offering statistical evidence sufficient to show that the practice in question has resulted in prohibited discrimination." *Armstrong v. Flowers Hospital, Inc.*, 33 F.3d 1308, 1314 (11th Cir.1994). Further, in an individual disparate treatment case, statistics may be relevant to establish that an employer's articulated reason for an employment action is pretextual. *McDonnell–Douglas, supra*, 411 U.S. at 804–05, 93 S.Ct. 1817 ("Other evidence that may be relevant to any showing of pretext includes ... petitioner's general policy and practice with respect to minority employment. On [this] point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks.") (citations and footnote omitted).

The role of statistical evidence in establishing a *prima facie* case of discrimination in an individual disparate treatment case, however,

is not as clear. In *Carmichael, supra,* the Eleventh Circuit stated:

> If they are strong enough, statistics alone may be enough to create a *prima facie* case of classwide discrimination. And there is no doubt that statistics can be relevant and important in an individual case. But statistics alone cannot make a case of individual disparate treatment. "One of the purposes of Title VII is to make persons whole for injuries suffered on account of unlawful discrimination .... Before the court may award damages, plaintiff must first establish that she has, in fact sustained an economic loss from defendant's discrimination." Unless the individual plaintiff can point to some specific instance of discrimination, there is no wrong for the court to remedy. Even *Davis [v. Califano,* 198 U.S.App. D.C. 224, 613 F.2d 957 (D.C.Cir.1979)], recognizes that once statistics have established a pattern of discrimination, each individual plaintiff must still establish that he "has been denied an ... employment benefit ... in order to recover for particularized injuries." In *Perryman v. Johnson Products Co.,* [698 F.2d 1138 (11th Cir.1983)], this Court recognized that although a case of classwide discrimination might be made out by "compelling independent evidence of a pattern or practice of discrimination," in an individual case "each plaintiff bears the burden of proving that each employment decision that adversely affected him or her was the product of a discriminatory motive." This Court has also held "that a Title VII plaintiff bears the initial burden of establishing the economic injury resulting from the adverse employment action." For the plaintiff to establish economic injury, he must necessarily show that in fact he was the victim of an identifiable act of discrimination.
>
> In short, whether we analyze Carmichael's hiring claim under *McDonnell Douglas* or under *Davis,* he must point to a job that he was denied because of his race.

*Carmichael, supra,* 738 F.2d at 1131–32 (internal citations omitted). In *Carmichael,* discussing particular positions not addressed by the district court, the Eleventh Circuit then observed that if the district court found that the plaintiff was not qualified for such jobs or would not have accepted the job if offered, "this would defeat his claim." *Id.* at 1132.

■ Thus, it appears from *Carmichael* that an individual disparate treatment plaintiff may establish a *prima facie* case of discrimination *partially* through presentation of statistical evidence, if plaintiff is able to relate that evidence to a particular position that she was denied. *See also Carter v. Three Springs Residential Treatment,* 132 F.3d 635, 642 n. 5 (11th Cir.1998)(quoting *Carmichael, supra,* and finding that plaintiff who complained of non-selection to program director position had not carried his burden of production by showing that defendant had never hired a black program director); *but see Brown v. American Honda Motor Co., Inc.,* 939 F.2d 946, 952 (11th Cir.1991)(stating, in an individual § 1981 case, that "statistical evidence is an appropriate method for demonstrating both a *prima facie* case of discrimination and pretext."); *Hawkins,* 883 F.2d 977, 985 (11th Cir.1989)(noting, in an individual disparate treatment case, that "[a] plaintiff may also establish a *prima facie* case by presenting statistical proof of a pattern of discrimination" and analyzing the strength of plaintiff's statistical evidence). However, statistical evidence may be "so flawed as to render it insufficient to raise a jury question." *Furr v. Seagate Technology, Inc.,* 82 F.3d 980, 986–87 (10th Cir.1996) (citation omitted)(finding plaintiffs' statistics flawed because they "grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities."); *see also Brown, supra,* 939 F.2d at 952–54 (upholding summary judgment against plaintiff, despite evidence that out of 860 Honda dealers nationwide, only two were black, stating, "Statistics such as these, however, without an analytic foundation, are virtually meaningless. To say that very few blacks have been selected by Honda does not say a great deal about Honda's practices unless we know how many blacks have applied and failed and compare that to the success rate of equally qualified white applicants.") (citation omitted).

■ Plaintiff has introduced a report from John T. Meehan, Ph.D. (Plaintiff's Exhibits A, 50).[6] Meehan states:

> Based on the salaried employee roster for the Montgomery Water Heater Division 87.75% of the management positions were occupied by white males in 1997. White males occupied management positions at the rate of 93.3% in 1996, 90.4% in 1995, 90.4% in 1994 and 90.2% in 1993 (Attachment # 2). In contrast, white males occupied clerical positions at the rate of 31.25% in 1997. These data are based on Mr. Blanz's definition of a manager (anyone who supervises others). If you define managers in terms of federal job categories "A" or "OM" where males occupy management positions, the rate of the same were 89.6% in 1997, 94.6% in 1996, 89.3% in 1995, 89.1% in 1994 and 90.9% in 1993. This data clearly establishes a prime [sic] facie case of discrimination based on the overwhelming percentage of white males who fill managment [sic] positions. It would appear that no matter how a manager is defined, the incumbent is alomst [sic] always a white male. The records produced thus far by the Defendant reflect that in 1997 there are at least 53 women employed by Rheem who are potential managers. Therefore, the theoretical applicant pool is 41.4% female. Obviously, there is an overwhelming disparity in management in favor of males.

(Meehan report, Plaintiff's Exhibit A, p. 1). Defendant has filed the affidavit of Paul F. White, Ph. D., who criticizes Meehan's report and analysis. (Defendant's Exhibit SS). In response to White's affidavit, plaintiff has filed a supplemental affidavit from Meehan, in which Meehan criticizes and responds to White's criticisms. (Attachment 12 to Plaintiff's Response to Reply, filed 4/1/98). The court need not and does not attempt to determine whether Meehan's or White's evalua-

tion is correct. Accepting Meehan's factual statements and statistical conclusions as accurate for purposes of summary judgment, his reports are not sufficiently probative to establish a *prima facie* case of discrimination in promotions.[7]

The parties have agreed and advised the court that this case involves no claim of disparate impact. (*See* Order entered 5/21/98, p. 3). "In a disparate treatment case, the statistical evidence must be 'finely tuned' to compare the employer's relevant workforce with the qualified populations in the relevant labor market." *Forehand v. Florida State Hospital at Chattahoochee*, 89 F.3d 1562, 1575 (11th Cir.1996); *see also Smith v. Xerox Corporation*, 196 F.3d 358, 370 (2nd Cir.1999)(ADEA case)("In contrast to a disparate impact claim where the focus is on how a facially neutral employment practice affects a protected group, a disparate treatment claim looks at how an individual was treated compared to her *similarly situated* coworkers.")(emphasis added). In the present case, plaintiff's statistical evidence does not demonstrate that it provides a comparison of similarly situated individuals. Meehan identifies 53 females employed by defendant whom he describes as "potential managers." Meehan apparently identified these women as potential managers because they are listed as salaried employees.[8] His report does not indicate, however, that Meehan conducted any evaluation of the qualifications of the women identified as "potential managers." Meehan does not dispute White's statement that the number of salaried female employees includes 30 employees designated as clerical employees. Meehan responds that "there is evidence that, in the past, personnel have risen from the clerical ranks to management positions." (*See* Defendant's Exhibit SS; Meehan supplemental affidavit, p. 2). While this may be true, this evidence is insufficient to demonstrate that

---

6. This report is not an affidavit or declaration. However, defendant has not objected to the court's consideration of the report on the present motion.

7. The court does not, however, credit Meehan's conclusion that the percentages of male managers establish a *prima facie* case of discrimination. This determination is for the court.

8. Meehan does not state in his report whom he included in the number of female potential managers. However, he does not dispute White's statement that this is the correct number of salaried female employees. (*See* Plaintiff's Exhibit 50, Atch A; Defendant's Exhibit SS, p. 3; Meehan supplemental affidavit, p. 2).

females not placed in management positions are similarly qualified or situated to males who were promoted to those positions. While the statistical evidence offered by plaintiff might be probative in a disparate impact case, it is not sufficiently "finely tuned" to create an inference of discrimination as to plaintiff's disparate treatment claims. *See Furr, supra,* 82 F.3d at 987 (court held plaintiff's statistical evidence insufficient to create an issue of fact regarding pretext because "plaintiff's statistics grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities," and noted that " '[a] plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals.' ") (citations omitted); *Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1286–87 (5th Cir.1994)("Where plaintiffs use statistical evidence to challenge an employer's hiring practices, that evidence, to be probative of discriminatory intent, must compare the relevant portion of the employer's work force with the qualified population in the relevant labor market."). Thus, plaintiff's statistical evidence is not sufficient to establish a *prima facie* case of discrimination with regard to the promotions at issue.

*Circumstantial Evidence—Assistant Residential Product Manager*

*Prima Facie Case*

■■■ Plaintiff may establish a *prima facie* case with respect to promotion by showing that: (1) she belongs to a protected group; (2) she sought and was qualified for a position the defendant was attempting to fill; (3) despite her qualifications, she was rejected; and (4) after her rejection, the defendant either continued to attempt to fill the position or in fact filled the position with a person outside the plaintiff's protected class. *Walker, supra,* 158 F.3d at 1187–90. Defendant asserts that plaintiff cannot establish a *prima facie* case with respect to the Assistant Residential Product Manager position because she cannot establish: (1) that she applied for the position; (2) that she was quali-

fied for the position; or (3) that she was denied the position in favor of an equally or less qualified male. With regard to the latter argument, plaintiff is not required to demonstrate, as part of her *prima facie* case, that her qualifications equal or exceed those of the person selected. *Walker, supra.*[9] As to the issues of whether plaintiff applied for the position and whether she was "qualified," the evidence establishes a genuine issue of material fact.

The evidence reflects that Krantz, plaintiff's supervisor, submitted an application for the position for her at her request. (Burney depo., pp. 838–39). The selecting official, Rick Miller, states that he "received approximately 15 applications including a blank application which was submitted on Caroline Burney's behalf by Andy Krantz. I was informed that Caroline Burney was out of town during the posting period and had authorized Andy Krantz to submit her application in blank." (Miller aff., ¶ 4). Miller apparently treated the form submitted by Krantz as an application—according to Miller, he "reviewed the personnel files of all individuals who applied for this position including that of Ms. Burney." (*Id.,* ¶ 6). Defendant's evidence that plaintiff told a coworker, Patty McKenzie, that she was not interested in the position, and the evidence that plaintiff did not follow up on the application after it was filed does not defeat plaintiff's *prima facie* showing as to this position.

■■■ Regarding whether plaintiff was qualified for the position, Miller states that he does not believe that plaintiff was qualified for the position awarded to Cape. (Miller aff., ¶ 8). To establish her *prima facie* case, plaintiff need not show that she was the most qualified person for the position— it is sufficient if she presents evidence that she was minimally qualified. *See Walker, supra,* 158 F.3d at 1193. Plaintiff has filed a deposition excerpt that she identifies as the testimony of Melanie Billingsley, defendant's Human Resources Administrator. (*See* Plaintiff's Response to the Defendant's Reply to Plaintiff's Opposition Brief, p. 5 and attached exhibit labeled "Billingsley.").

---

9. *Walker* was decided after this case was fully briefed.

Billingsley testified that when bids came in for posted vacancies, "we gathered them together at first, and we pulled their folders and kind of put the bids with them at that time. The supervisor used the bid sheet as well as the employee folder when they were interviewing the employees that were interested in the job." (Billingsley depo., pp. 22–23). Although plaintiff has neglected to file the deposition transcript page including the question asked of Billingsley, Billingsley further testified "... and I would look at them at that point. And what I did, I looked at it and I made sure that everybody met the minimum requirements. If they did not meet the minimum requirements, I placed them aside to send a letter saying they did not qualify at that time." (*Id.*, p. 25). She testified that she looked at the bid sheets and the applicant's employee folders to determine whether or not they met the minimum requirements for the posted position. (*Id.*). In her supplemental affidavit, plaintiff states that she was never notified by Human Resources that she was not qualified for the Assistant Residential Product Manager position. (Burney supplemental aff., ¶ 6). This evidence establishes the existence of a genuine issue of material fact regarding whether plaintiff met the minimum qualifications for the position.

*Legitimate Non–Discriminatory Reason*

Miller states that he "needed a person with familiarity in product development and manufacturing ... with a business background," and that after considering all of the applicants for the Assistant Residential Product Manager position, he determined that he had not found the right person. (Miller aff., ¶ 7). Miller further states that he felt Cape was perfect for the job, that Cape "is an engineer with an MBA, had experiences as Plant Engineer, Industrial Engineer, Marketing Research Analyst and Marketing Research Manager," that Cape "had experience in product development and manufacturing," and that in Miller's opinion, Cape was "clearly more qualified than any other person considered for the position." (*Id.*, ¶¶ 7–8). Miller also states, "My personal experience with Ms. Burney in terms of the [product] literature was less than satisfactory. I was partic-

ularly interested in Caroline Burney taking more responsibility for the overall management of the literature, but she simply would not take the initiative. When dealing with Ms. Burney on literature issues, I noticed a distinct lack of product knowledge and a lack of willingness to develop it." (*Id.*, ¶ 6). This testimony satisfies defendant's burden of articulating a legitimate, non-discriminatory reason for the decision not to promote plaintiff to the position of Assistant Residential Product Manager. *See Evans v. Technologies Applications & Service Company*, 80 F.3d 954, 960 (4th Cir.1996)("Job performance and relative employee qualifications are widely recognized as valid, non–discriminatory bases for any adverse employment decision.").

*Pretext*

As evidence of pretext, plaintiff points to her statistical evidence, the statements made by Dykstra and Adams, and her qualifications for the position. (Plaintiff's Brief, p. 60; Plaintiff's Surreply Brief, pp. 3–4).

*Dykstra/Adams statements.* As noted above, Adams was not a decision-maker with regard to this position, and did not make his statement in the presence of a decision-maker. Thus, Adams' statement that the only way to avoid sexual harassment problems is not to hire women is not relevant to the determination of whether Miller's stated reasons for his decision are pretextual. *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1333–34 (11th Cir.1998)(finding no evidence of pretext despite "speculation of a non-decisionmaker" that plaintiff was not promoted because he was not Hispanic). Dykstra's statement, again, is conclusory and not sufficiently specific to establish the existence of a genuine issue of material fact on the present motion.

*Statistical evidence.* With regard to the Assistant Residential Product Manager position, Meehan states:

An examination of the job vacancy announcement (Attachment # 5) and the position description (Attachment # 6) for the subject position, failed to show any empirical relationship between the stated qualifications and skills, knowledge, and abilities in the position description. In short, there

is no evidence to show any type of job analysis to support the relevance of the required qualifications and the successful performance of the individual in this position. The EEOC Uniform Guidelines on Employee Selection Procedures (1978)(Federal Register 43:38290–38315) require the demonstration of the validity of such qualifications when hiring procedures have an adverse impact against any specific group. Adverse impact is defined as a case where the selection rate for the affected group is less than 80% of the group with the highest rate of selection. If there is an adverse impact the employer must show that the hiring procedures are valid. There is simply no evidence currently available that this has occurred in the case of Rheem. In fact, after examining a performance appraisal form (Attachment # 7) it would be difficult if not impossible to demonstrate the validity of the qualifications stated in the vacancy announcement. Although the appraisal system attempts to compare employee performance with various "standards", these standards are not published if, they at all exist.

In addition to the suspect validity of the position statement there is no evidence that Rheem made any attempt to include females (or other minorities) in the pool of applicants for this position. Simple efforts such as minimal advertising and recruiting did not occur. In fact, position announcements were displayed for some positions and them for only three (3) days. Efforts to consider minority applicants are required when there is an adverse impact against any group.

In answering Ms. Burney's complaint the EEOC investigator pointed out, for example, that the successful applicant for the position had a degree in engineering. He further stated that this degree provided more knowledge of the mechanical aspects of Rheem's products. (Attachment # 8). In fact, the successful candidate had a degree in industrial engineering which is not a field in engineering directly concerned with the mechanical aspects [of] products. In addition, the vacancy announcement made no mention of an engineering degree as a minimal or desirable qualification. In summary, it appears that based on the information currently available, even the most casual observer must conclude there was a clear pattern of discrimination against females for this particular position. In addition, there is no credible evidence that any effect was made to correct this situation.

(Meehan report, pp. 2–3).

Dr. Meehan first criticizes defendant's failure to validate its selection procedures in accordance with the EEOC Uniform Guidelines on Employee Selection Procedures. However, the guidelines do not require validity studies unless a selection procedure has had an adverse impact on a protected group. 29 C.F.R. § 1607.1(B)("[The guidelines] are designed to provide a framework for determining the proper use of tests and other selection procedures. These guidelines do not require a user to conduct validity studies of selection procedures where no adverse impact results."). As noted above, the parties have advised the court that this case does not involve a claim of disparate impact. (*See* Order, 5/21/98, p. 3).

Plaintiff has not demonstrated that a particular selection procedure used with regard to the position at issue had an adverse impact on women. Meehan states that "adverse impact is defined as a case where the selection rate for the affected group is less than 80% of the group with the highest rate of selection." (Meehan report, p. 2). The EEOC guidelines referred to by Meehan discuss this "four-fifths" rule, and state that a selection rate for any sex which is less than eighty percent of the rate for the group with the highest rate "will generally be regarded by the Federal enforcement agencies as evidence of adverse impact." 29 C.F.R. § 1607.4(D). However, the guidelines recognize that "greater differences in selection rate may not constitute adverse impact where the differences are based on small numbers and are not statistically significant...." (*id.*), and that there may be an insufficient number of selections with regard to a particular job to determine whether there has been an adverse impact (*see* 29 C.F.R. § 1607.15(A)(2)(c)). It appears that

Meehan bases his conclusion of adverse impact—to the extent that he makes such a conclusion—on analysis of this single selection and, perhaps, on the percentages of males in management positions from 1993–1997.[10] He provides no information, however, on the numbers of promotion selections that occurred for any period of time during which defendant employed a particular selection procedure or the number of qualified contenders of each sex for these promotions. The "four-fifths" rule upon which Meehan relies depends upon analysis of "selection rates," which in turn depends upon the number of applicants or candidates for particular positions. *See* 29 C.F.R. § 1607.16(R); § 1607.4(D). The court concludes that the defendant's failure to validate its required qualifications for the position in accordance with the EEOC guidelines cited by Meehan does not constitute evidence that the defendant's articulated reasons for not selecting plaintiff are pretextual.

■ Meehan also states that there is no evidence that defendant made any attempt to include females in the pool of applicants for this position. He specifically notes defendant's practice of posting vacancy announcements for only three days. (Meehan report, pp. 2–3). However, Meehan has not suggested how this three-day posting practice works to the detriment of female employees, as opposed to all of the employees. Further, Meehan states that of eighteen people who applied for the Assistant Residential Product Manager position, ten were female. (Meehan supplemental affidavit, p. 3). Thus, defendant's failure to post the announcement of the Assistant Residential Product Manager position for more than three days does not demonstrate that defendant's articulated reasons for not selecting plaintiff are pretextual.

Further, as noted above, Meehan's statistics regarding the overall percentages of male managers are not sufficiently "finely tuned" to create an issue of fact in this case.

*See Furr v. Seagate Technology, Inc., supra,* 82 F.3d at 987 (Tenth Circuit held plaintiff's statistical evidence insufficient to create an issue of fact regarding pretext because "plaintiff's statistics grouped all employees together regardless of specialty or skill and failed to take into account nondiscriminatory reasons for the numerical disparities," and noted that " '[a] plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between comparable individuals.' ") (citations omitted).

*Relative qualifications.* As noted above, Miller stated that he believed Cape to be clearly more qualified than any of the applicants for the Assistant Residential Manager position because of his education and past work experience, specifically including his experience with product development and manufacturing. Plaintiff contends that she was the "most qualified" for the position, and that "Cape could in no way even come close to vying against Plaintiff on the Special Skills necessary." (Plaintiff's surreply brief, pp. 3–4).

The vacancy announcement for the position set forth the following "basic qualifications":

Required Educational/Experience Level:

4 year business degree with emphasis in Marketing or Management preferred. Practical knowledge of both wholesale and retail residential product lines. A general knowledge of manufacturing and product development processes.

Special Skills Necessary:

Excellent problem solving and organizational skills required. Ability to work independently with minimal supervision. Strong written and verbal communication skills needed. Ability to work with and

---

**10.** Meehan admits that he "failed to conduct a statistical test for the presence of adverse impact by comparing the female representation among the new hires and the promoted employees to the representation of females in the 'relevant labor pool.' " (Meehan supplemental affidavit, p. 4). He blames this failure on defendant's failure "to provide any data concerning promotions or new hires." However, plaintiff has made no motion pursuant to Rule 56(f). Therefore, the present motion will be resolved without reference to any discovery that might have been conducted or produced.

lead project teams. Extensive contact with internal and external customers.

(Plaintiff's Exhibit 40).

In support of her argument regarding her qualifications, plaintiff cites her supplemental affidavit (Plaintiff's surreply brief, pp. 3–4), in which she states:

Based on the way the salaried vacancy announcement for Assistant Residential Product Manager is written, I was the most qualified for the job. As it reads, a four-year college degree is required with business and marketing or management preferred. While I had a Master's degree in Human Resources (with emphasis in Management), that more than qualifies. I had almost four years of practical knowledge of both wholesale and retail residential product lines due to working with product managers in the planning and development of sales promotions materials, including product specification sheets, brochures, displays, product guides and price sheets. My general knowledge of manufacturing and the product development process came from the aforementioned duty as well as working with Traffic, Customer Service and Production in order to assure the best possible product samples for trade shows.

Alan Cape could in no way even come close to vying against me on the Special Skills necessary. I proved my ability to work independently with minimal supervision because I had none in the Advertising Department. I have excellent problem-solving and organizational skills as evidenced by the tremendous workload I undertook in order to be recognized just to be considered for a promotion including additional trade shows, devising, implementing and evaluating sales promotions; and creating evaluation processes for trade shows. I even had to complete complex sales promotions initiatives within a six month time period over and above my other standard duties. My ability to juggle several extensive projects and carry them out successfully is proved by my work performance. My major duties always involved working with lead project teams and I had constant contact with internal and external customers on a daily basis. No one, particularly customers and especially top customers was very familiar with Alan Cape. The [sic] all knew and worked successfully with me, however.

(Burney supplemental aff., ¶¶ 5–6). Plaintiff also cites Meehan's report, in which Meehan states that the vacancy announcement does not mention an engineering degree as a minimal or desirable qualification, and that industrial engineering is not a field in engineering directly concerned with the mechanical aspects of products. (Plaintiff's Brief, p. 55; Meehan report, p. 3).

In *Scott v. University of Mississippi*, 148 F.3d 493 (5th Cir.1998), an age discrimination case, the Fifth Circuit discussed the use of relative qualifications to establish pretext:

... Scott claims that not only was she better qualified than Gullick, she was clearly better qualified. Specifically, she claims that the jury could have found that her Ph.D. in English, Masters in Library Science, college teaching experience, Mississippi Supreme Court clerkship, and experience teaching legal research to law students compared to Gullick's B.A. in English, federal clerkship, and two years teaching high school made Scott so clearly better qualified that the University's reasons for not selecting Scott must have been pretexts for age discrimination.

We have held that "a plaintiff can take his case to a jury with evidence that he was clearly better qualified than younger employees" who were selected for the position at issue. *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 123 (5th Cir.1992)...; *see also E.E.O.C. v. Louisiana Office of Community Servs.*, 47 F.3d 1438, 1444 ("A factfinder can infer pretext if it finds that the employee was 'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected."). "However, this evidence must be more than merely subjective and speculative." *Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 42 (5th Cir.1996). "To establish a fact question as to relative qualifications, a plaintiff must provide sufficiently specific reasons for his opinion; mere subjective speculation will not suffice." *Id.*

Moreover, in pursuing this inquiry, we recognize that "the judicial system is not as well suited by training and experience to evaluate qualifications ... in other disciplines as are those persons who have trained and worked for years in that field of endeavor for which the applications under consideration are being evaluated." *Louisiana Office of Community Servs.*, 47 F.3d at 1445. Thus, "unless disparities in *curricula vitae* are so apparent as virtually to jump off the page and slap us in the face, we judges should be reluctant to substitute our views for those of the individuals charged with the evaluation duty by virtue of their own years of experience and expertise in the field in question." *Id.* *Scott*, 148 F.3d at 507–08 (footnote omitted).

Miller, the selecting official, states that he needed someone with "familiarity in product development and manufacturing" and a "business background." (Miller aff., ¶ 7). Miller stated that Cape "is an engineer with a MBA, had experiences as Plant Engineer, Industrial Engineer, Marketing Research Analyst and Marketing Research Manager," and "had experience in product development and manufacturing." (*Id.*). Cape describes his education as follows:

I received a Bachelor of Industrial Engineering degree from Georgia Tech in March of 1989. The curriculum for the school of Industrial and Systems Engineering includes a wide variety of engineering and business courses. The focus is to obtain the skills to analyze and improve a process, method, operation, or business situation. The curriculum ranges from industrial engineering type courses such as simulation modeling, process control, quality control, forecast modeling, facilities planning, project management, to business type courses such as accounting, finance, economics, and general management. Other course within the curriculum were in the schools of Mechanical Engineering, Electrical Engineering, Information Systems, and Humanities (business writing, public speaking, etc.)

I received a Master of Business Administration (MBA) from Auburn University in Montgomery in December of 1993. The MBA was a "general business" degree with course work focused on finance, economics, and marketing.

(Cape aff., ¶¶ 5–6).

Plaintiff has a Bachelor of Science in natural resources and international political science from the University of the South (Sewanee). She did not take any marketing or business courses at Sewanee. (Burney depo., pp. 6–7). Plaintiff has a Master's degree in Human Resources, with an emphasis in management. (Burney supplemental aff., ¶ 5). Her study included some organizational development management courses. (Burney depo., pp. 10–11).

Regarding her experience in product development and manufacturing, plaintiff states that she "had almost four years of practical knowledge of both wholesale and retail residential product lines due to working with product managers in the planning and development of sales promotions materials, including product specification sheets, brochures, displays, product guides and price sheets" and a "general knowledge of manufacturing and the product development process [which] came from the aforementioned duty as well as working with Traffic, Customer Service and Production in order to assure the best possible product samples for trade shows." (Burney supplemental aff., ¶ 5).

In comparison, Cape states:

I was in the industrial engineering department for three years (8/90 to 7/93) as an industrial engineer. One of our responsibilities included process design and costing for our manufacturing facilities and products. This meant being familiar with and understanding all the operations, materials, planning, and cost for the manufacture of our product.... I also worked in the marketing research department for three years (8/93 to 9/96) as a marketing analyst and marketing research manager. One of our functions was to provide quantitative analysis to help understand the cost and profit impact of marketing decisions. This required developing an Activity Based Strategic Cost management system. My previous industrial engineering experience proved fruitful in this capacity as well because of the functions required to under-

stand and trace cost our product lines and processes.

(Cape aff., ¶¶ 7–8).

■ Regarding the "special skills" required for the position, it is obvious that plaintiff considers herself well-qualified. However, her conclusion that "Alan Cape could in no way even come close to vying against me" is conclusory and not supported by any specific facts regarding Cape's capabilities and skills. (*See* Burney supplemental aff., ¶ 6). Plaintiff claims that no customers were familiar with Cape, but does not set forth any specific facts supporting this conclusion. (*Id.*). Thus, plaintiff's evidence does not create an issue of fact regarding whether she was better qualified than Cape with regard to the "special skills" required for the Assistant Residential Product Manager position.

Miller further cited Cape's experience as "Marketing Research Analyst and Marketing Research Manager." (Miller aff., ¶ 7). As noted above, Cape spent three years at Rheem in this capacity. Cape described his job duties in his résumé:

— Function as part of the Marketing team to increase profitability through providing various types of quantitative analysis that assist in understanding the cost/profit impact of marketing decisions.

— Provide financial, statistical, and business system analysis and support for marketing decision making.

— Assist in the development, use & modification of an Activity Based Strategic Cost Management System.

— Quantitative analysis for decision support in the areas of customer pricing, customer profitability, and product selection.

— Support marketing and sales personnel through providing market share analysis, market forecasting, customer service analysis, and other sales performance data.

— Contributed in the development and implementation of marketing information & computer systems.

— Develop computer generated presentations and assist with customer presentations.

(Attachment to Cape affidavit).

In her affidavit, plaintiff describes her duties as Assistant Sales Promotion Manager:

I was hired as the Assistant Sales Promotion Manager, assigned to coordinate all trade shows, all literature fulfillment, and to develop and implement and evaluate all sales promotions, except for the rare 'national' ones that would be implemented by my supervisor, Andrew Krantz, the Sales Promotion Manager. My job description also stated that I was to assist the Sales Promotion Manager with his or her respective duties. Immediately after I was hired I begin [sic] developing small-scale sales promotions for various customers across the U.S. at the request of the District Sales Managers and the customers themselves. I performed one to two hundred of these type promotions each year.... When Mr. Krantz was promoted to National Advertising Manager, I assumed all of the responsibilities of the Sales Promotion Manager.[11] I also did additional work above and beyond the duties of both Assistant Sales Promotion Manager and Sales Promotion Manager willingly in order to get more experience, challenges and to be

---

11. The responsibilities of Sales Promotion Manager were to:

Work with product managers in the planning and development of sales promotion materials, including product specification sheets, brochures and displays.

Work with advertising agencies, artists, printers and others writing or supervising preparation of sales aids for approval by advertising and product managers.

Purchase art work printed matter, signs and related sales promotion materials adhering to company procurement policies with additional production controls as deemed necessary.

Supervise the receipt and distribution of sales promotion literature and sales aids to customers and salesmen.

Responsible for budgets assigned for the purpose of literature and sales promotion material and procurement.

Coordinate the preparation and development of advertisements and special projects such as slide presentation, motion pictures, trade shows and sales meetings.

(Position Description, Sales Promotion Manager, Defendant's Exhibit P).

promoted. I increased the duties of my job and developed it to a level of sophistication in evaluation and service never known before or since. My experience in Business and Marketing totalled [sic] seven (7) years in 1995 and it was by no means limited.

(Burney aff., ¶ 3).

Plaintiff describes her marketing experience prior to her employment with Rheem as follows:

I began my career in Marketing before I even graduated from the University of the South. As a rising Junior, I worked in the Governor's Office and answered correspondence to his constituents with minimal supervision. I wrote the Governor's speeches on the drought of that summer (which he spoke from word for word), and I coordinated a major press conference. I wrote press releases as well. As a rising Senior, I gathered information, largely wrote, and drafted the *first ever* Annual Report of the State Treasurer's Office and I had only two months in which to prepare it. (Special thanks are given to me in the back of it). I also wrote speeches and press releases and gave presentations throughout the State on new programs the office was developing—i.e., I "marketed" such things as the Linked Deposit Program to major business and civic groups throughout the State. I continued such efforts as a recent graduate during the summer post graduation.

I was hired to work for Union Bank after an extensive interview process with the Vice President of Marketing and the Vice President of Human Resources for Union Bank. I *heard* of this opening through a visit from the Vice President of Marketing of Union Bank to the Treasurer's Office. I negotiated my salary and benefits and got the job, beating out other contenders due to my education and communications/marketing experience. As I stated previously in my deposition, I assisted in preparing the Corporate Annual Report. I also wrote press releases for the bank and I was solely responsible for the corporate newsletter. I also assisted my supervisor in working with an Ad Agency to put

together television commercials such as "Bank with the bank that lives where you do. Come home to us … Union Bank." At the U.S. Forest Service I was *promoted* from Biologist to Forester. There I *did* P.R. campaigns for "Woodsy the Owl" and "Smoky the Bear". I also, *without assistance*, did all the contract work, all pulpwood processing duties, and wrote and awarded contracts for small timber sales to local pulpwood companies.

Winton Blount hired me because he knew through mutual friends I was looking for a job. Since he also has a Sewanee background, he knew of my capabilities and interviewed me intensely to see if I could help on a number of endeavors he was pursuing. *All* of my campaign work involved writing press releases, speeches, assisting in the development of campaign literature, assisting in the creation of political ad campaigns and television commercials (even editing some scripts) and coordinating media and political engagements. I also worked on marketing the Educational Committee Goals of the Montgomery Area Chamber of Commerce. This involved writing speeches and press releases and assisting the Chamber in marketing and advertising campaigns to assist their program on better education in Montgomery.

(Burney supplemental aff., ¶¶ 1–4)(emphasis in original).

The evidence of record pertaining to the relative qualifications of plaintiff and Cape does not create an issue of fact regarding whether defendant's articulated reasons for plaintiff's non-selection are pretextual. Plaintiff's evidence does not rise to a level sufficient to create an issue of fact regarding whether she was so clearly better qualified than Cape as to permit an inference that the reasons articulated by Miller for selecting Cape are pretextual. The disparities between plaintiff's qualifications and Cape's qualifications are by no means, in the words of the Fifth Circuit, "so apparent as virtually to jump off the page and slap [the court] in the face." *Scott*, 148 F.3d at 508.

■ *Anita Kuhlman's Opinion.* In support of her claim, plaintiff cites the deposi-

tion testimony of Anita Kuhlman that she had told Miller that the only reason she and other women did not get the Assistant Residential Products Manager position was because they were not male. (Plaintiff's surreply brief, p. 5). Kuhlman testified as follows:

Q It is your opinion that you were more qualified than Allen Cape in terms of experience and seniority?

A I didn't say that.

Q You don't believe that?

A I said I was more qualified than Caroline Burney for that job.

Q Do you believe you were as qualified as Allen Cape for that position?

A I don't know exactly what Allen's background is. I know that he was qualified for the position. I believe that I was also qualified for the position and somebody made a judgment call.

Q Didn't you tell Rick Miller that the only reason you and other women did not get that job is because you weren't male, or words to that effect?

A Yes. I said that's what I felt.

Q And you were telling the truth, weren't you?

A When I said that was my opinion, yeah. But he didn't say yes, that's the case.

(Kuhlman depo., pp. 217–18). This testimony sets forth only Kuhlman's conclusory opinion that Miller made his selection based on gender, and does not include the facts upon which she bases that opinion. This testimony is clearly insufficient to create an issue of fact on the present motion.

*Conclusion.* Miller states that he selected Cape because of Cape's superior qualifications and because of Miller's dissatisfaction with his previous dealings with plaintiff in the area of product literature. The court has considered whether the evidence relied on by plaintiff, considered in the aggregate, is sufficient to create an issue of fact regarding whether the reasons articulated by Miller for his decision are pretextual, and concludes that it is not. Accordingly, defendant is entitled to summary judgment on plaintiff's claim that defendant discriminated against her

when she was not selected for the position of Assistant Residential Product Manager.

*Circumstantial Evidence—Sales Promotion Manager*

*Prima Facie Case*

As noted above, a plaintiff may establish a prima facie case of discrimination with respect to promotion by showing that: (1) she belongs to a protected group; (2) she sought and was qualified for a position the defendant was attempting to fill; (3) despite her qualifications, she was rejected; and (4) after her rejection, the defendant either continued to attempt to fill the position or in fact filled the position with a person outside the plaintiff's protected class. *Walker v. Mortham, supra,* 158 F.3d at 1187–90. Citing *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976) and *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181 (11th Cir.1984), plaintiff argues that she may establish a *prima facie* case with respect to this failure to promote claim by showing that: (1) she is a member of a protected class; (2) an adverse employment decision has been made; and (3) she was treated differently from similarly situated employees outside her class. (Plaintiff's Brief, p. 58). However, *McDonald* and *Nix* both involved claims of discriminatory discipline, not promotion.

The Eleventh Circuit has "repeatedly emphasized that the requisite showings that make up a *prima facie* case are not meant to be rigid or inflexible." *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1268 (11th Cir.1999).

In cases where the evidence does not fit neatly into the classic *prima facie* case formula, for example, [the Eleventh Circuit has] stated that "a *prima facie* case of disparate treatment can be established by any 'proof of actions taken by the employer from which we infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations.'"

*Id.* (citation omitted). The Eleventh Circuit has also noted, however, that "it is generally unwise to fragment the applicable legal stan-

dards in this area [of requirements of the *prima facie* case]." *Walker, supra*, 158 F.3d at 1185. The court need not decide which formulation of the *prima facie* case is the proper one for use on the present facts, because plaintiff has failed to establish a *prima facie* case under either formulation.

The position sought by plaintiff was that of "Sales Promotion Manager." (*See* Defendant's Exhibit Q, EEOC charge). The parties have argued vigorously over whether there was, in fact, a "vacancy" for the position of Sales Promotion Manager. However, assuming that plaintiff can establish the first three elements of the *prima facie* case under the first formulation, she has not introduced evidence on the fourth element, *i.e.*, that after her rejection, the defendant either continued to attempt to fill the position or in fact filled the position with a person outside the plaintiff's protected class. Defendant argues that it did not seek applicants or fill the Sales Promotion Manager position. (Defendant's Reply brief, p. 4). Defendant has introduced evidence that the position was not available and has never been filled. (Martin statement, ¶ 20). Plaintiff has introduced evidence that when she asked for the position, she was never told that it was not available, and that Krantz told plaintiff that if she met the goals Martin and Krantz had set for her, she might be promoted to sales promotion manager. (Burney depo., p. 806–07). Martin states that plaintiff had not substantially met the goals and initiatives by the time of her mid-year evaluation, and that Krantz advised plaintiff, with Martin's concurrence, "that we had decided that she was not yet ready for a promotion, but that her readiness for a promotion would be under continuing consideration." (Martin statement, ¶ 12).

█ Plaintiff has directed the court to no evidence that after her request for a promotion was turned down, defendant sought applicants for the position or filled the position with a male. Thus, she has not established a *prima facie* case under the first formulation set forth above.[12]

Again, plaintiff argues that she may instead establish a *prima facie* case by showing that: (1) she is a member of a protected class; (2) an adverse employment decision has been made; and (3) she was treated differently from similarly situated employees outside her class. (Plaintiff's Brief, p. 58). Plaintiff argues that she was performing substantially all of the duties of the Sales Promotion Manager position, that the company had a policy of creating positions for males in similar circumstances, and that she was situated similarly to Richard Miller, who was promoted into the position he had been performing for several months.

Plaintiff has introduced evidence that, in 1982, Richard Miller of Rheem's Chicago office was promoted from Sales Office Representative to Sales Office Administrator. On defendant's employee status change form, the justification for the promotion was, "Rick is being promoted into the position in which he has been performing for several months." (Plaintiff's Exhibit I). Plaintiff has also introduced evidence that Alan Cape received a raise in 1992 when he was transferred from the position of Time & Methods Engineer to Industrial Engineer. The justification on his status change form reads, "Mr. Cape is being laterally transferred to the position of Industrial Engineer (formerly Time & Methods Engineer) due to a realignment of responsibilities within the Industrial Engineering Dept. His experience, education and ability qualify him for this position. His salary is in line with his responsibilities and contemporaries." (*Id.*). Plaintiff has also filed the employee status change form reflecting Krantz' promotion in 1994. The form reflects that he was promoted from Sales Promotion Manager to National Advertising and Sales Promotion Manager, and the justification was that, "Andy is being promoted into a classification in which he's been performing for sometime. The promotional increase includes his salary review increase scheduled to go into effect 4-1-94. Please cancel same." (*Id.*). Another employee status change form reflects that David Hanning was promoted from Commercial Product Manager to Commercial Marketing Manager on January 16, 1997, with the justification that

---

12. In response to the court's order directing plaintiff to list her promotion claims, plaintiff concedes that defendant did not seek applicants for this position. *See* Doc. # 115, p. 2.

"Dave's being promoted into a position in which he's been performing for the past several months." (*Id.*).

■ To carry her burden of establishing that she was treated differently from a similarly situated male, "plaintiff must show that she and the nonprotected person 'are similarly situated in all relevant respects.'" *Anderson v. Twitchell–A–Tyco*, 76 F.Supp.2d 1279, 1286 (M.D.Ala.1999) (quoting *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir.1997)). "'To be deemed 'similarly-situated,' the individual with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are [treated or] disciplined in different ways.'" Anderson, supra (quoting *Malladi v. Brown*, 987 F.Supp. 893, 909–10 (M.D.Ala.1997)). "In addition, 'plaintiff must show that employees are treated differently for nearly identical conduct.'" Anderson, supra (quoting *Eldridge v. Morrison*, 970 F.Supp. 928, 934 (M.D.Ala.1996)).[13]

■ Plaintiff's evidence falls far short of that required to demonstrate that she is similarly situated to the males for whom she has included status change forms in Exhibit I. (Plaintiff's Brief, p. 60; Plaintiff's Exhibit I). Plaintiff asserts that when Krantz was promoted, she "assumed all of the responsibilities of the Sales Promotion Manager." (Burney aff., ¶ 3). It is undisputed that plaintiff was never awarded the position of Sales Promotion Manager. Her evidence, viewed in the light most favorable to plaintiff, shows only that the male employees she has identified were transferred or promoted to positions for which they had been performing the duties. This evidence is insufficient to permit a conclusion that these male employees

were "similarly situated" in all relevant respects to plaintiff.

Miller was promoted in 1982 within the Order department in Chicago. His supervisor was J.P. Rogers. Cape was laterally transferred and given a raise within the Industrial Engineering department. His supervisor was Glenn Godbee. (Plaintiff's Exhibit I). Hanning was supervised by Doug Smith prior to his promotion, as was Krantz. (*Id.*). Thus, the decision-makers for these promotions were different. In addition, plaintiff has not made any attempt to show, with respect to the promotions she has identified for Cape, Miller, or Hanning, that they had duties similar to hers or that their performance was comparable to hers. As to Krantz, defendant has introduced evidence that Krantz became the head of the advertising department when he was promoted to Sales Promotion Manager in 1989, upon the departure of his supervisor, Connie Siebert. (Krantz depo., p. 105; Blanz supplemental aff., ¶ 4; Martin statement, ¶ 20). After his 1994 promotion, Krantz remained the head of the advertising department. (Attachment 2 to Martin statement; *see also* Attachment C to Burney aff. (Krantz identified as "Supervisor of 3" both before and after promotion to National Advertising Manager)). Plaintiff has not demonstrated that she and Krantz or the other males identified in Exhibit I were similarly situated in all relevant respects when the males were awarded raises or promotions. On the evidence before the court, their respective positions and circumstances are not sufficiently similar to plaintiff's to permit an inference of discrimination. Thus, plaintiff has not established a *prima facie* case of discrimination with regard to defendant's failure to promote her to Sales Promotion Manager even under her own view of what is necessary for a *prima facie* case. Accordingly, defendant is entitled to summary judgment on plaintiff's claim regarding defendant's failure to promote her to the position of Sales Promotion Manager.

### Director of Marketing

In its original motion for summary judgment on plaintiff's promotion claim, defen-

---

**13.** The cases cited by the court in *Anderson* (*Holifield, Malladi,* and *Eldridge*) all involved allegedly discriminatory application of discipline.

*Anderson,* in contrast, involved a claim that the plaintiff was denied an employment benefit—travel pay—given to a similarly situated male.

dant addressed only the Sales Promotion Manager and Assistant Residential Manager positions. In her response to the motion for summary judgment, plaintiff contended that she was also discriminatorily denied the positions of Director of Marketing and International Sales Manager.[14] In its reply brief, to which plaintiff has responded, defendant argues, *inter alia*, that plaintiff's claim regarding the Director of Marketing position is time-barred. (Defendant's reply brief, p. 5, p. 22 n. 10). In her surreply brief, plaintiff does not respond to defendant's argument regarding timeliness. (*See* Plaintiff's surreply brief, pp. 5–6). Defendant has filed evidence that Martin has held the position of Director of Marketing since December 15, 1995, and that he first met with plaintiff on or about December 19, 1995. (Martin statement, ¶¶ 2, 6). Plaintiff admits that she met with Scott Martin in December 1995, just after he was named Director of Marketing. Plaintiff testified that she told Martin during this meeting that she was the victim of sex discrimination. She told Martin that she should be the Sales Promotion Manager and that the only reason she was not was because of sex discrimination. (Burney supplemental affidavit, ¶ 8; Plaintiff's surreply brief, p. 9;

Burney depo., pp. 161–62). Thus, in December of 1995, plaintiff was aware of Martin's selection as Marketing Director, at a time when she believed she was being denied promotional opportunities because of her gender. Plaintiff's charge of discrimination was filed with the Equal Employment Opportunity Commission on July 11, 1996. (Plaintiff's surreply brief, p. 12; Defendant's Exhibit Q).

██ Plaintiff may not bring a Title VII claim based on a discrete act of discrimination occurring more than 180 days before she filed her EEOC charge. *See Patterson v. Augat Wiring Systems, Inc.*, 944 F.Supp. 1509, 1517 (M.D.Ala.1996)(citing *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir.1992)). On the facts before the court, defendant's failure to promote plaintiff to the position of Director of Marketing, assuming that it was discriminatory, was a discrete act of discrimination. *See Dudley v. Wal–Mart Stores, Inc.*, 931 F.Supp. 773, 792 (M.D.Ala.1996); *see also Roberts v. Gadsden Memorial Hospital*, 850 F.2d 1549 (11th Cir. 1988). Even if plaintiff became aware of Martin's hire as late as December 31, 1995, her EEOC charge was filed 12 days too

---

14. Plaintiff actually argues that "Many jobs became available that she did not even know were available or could have been available to females and minorities, including, the Director of Marketing position, the International Sales Manager position." (Plaintiff's Brief, p. 50). She further argued that she was "denied, among other promotions, a promotion to the positions of Director of Marketing, International Sales Manager, Assistant Residential Products Manager and Sales Promotion Manager," and that "from the entire time that the Plaintiff began working at Rheem, every time promotions were announced in marketing, which appeared to be the fast-track to senior-level management, vice presidencies, etc., these positions would be created and were filled by white males, with their previous job positions disappearing most of the time." (Plaintiff's Brief, pp. 55–56 and n. 58). In an attempt to "nail down" plaintiff's promotion claims, the court entered an order directing plaintiff to file a list of the promotions that form the basis of her claims. (Order entered 11/23/99). Plaintiff resisted this effort. She responded with a list including the four positions identified above. She also makes some suggestion that she could not respond fully to the order due to outstanding discovery. (*See* Doc. # 15, n. 1). As noted previously, plaintiff has filed no motion pursuant to

Rule 56(f). In her response to the court's order requiring a list of positions forming the basis of her promotion claim, plaintiff also states:

In addition, during Plaintiff's employment with Rheem when a promotion was announced in the Marketing Department, and elsewhere in the company, it would be for the promotion of a white male to a newly created position. Further, after these men were promoted, Rheem made a practice of eliminating the positions these men had held prior to their promotions. (Doc. # 115, p. 5)(citing Plaintiff's Opposition Brief at 55 and 56 n. 58 and Burney aff., ¶ 16 and Atch C). Attachment C to plaintiff's affidavit consists of flow charts showing the career progression of certain employees at Rheem. Plaintiff did not list most of the promotions shown on the flow charts in accordance with this court's order. Thus, the court concludes that she does not contend that she was discriminated against with regard to any of the promotions appearing in Attachment C that were not specifically identified to the court on pages 1–4 of her response to the court's order (Doc. # 115). Additionally, plaintiff attached evidence to her list of promotions. The court did not request or authorize the filing of evidence and has not considered it on the present motion.

late.[15] Thus, plaintiff's claim arising from defendant's failure to promote her to the Director of Marketing position is barred by the statute of limitations, and defendant's motion for summary judgment will be granted as to this claim.

### International Sales Manager

In support of its argument that it is entitled to summary judgment as to any claim that plaintiff was discriminated against when she was denied the position of International Sales Manager, defendant argues that plaintiff cannot establish a *prima facie* case as to this position because: (1) plaintiff is not qualified for the job; and (2) she has a "tiny fraction" of the qualifications of the selectee, Anthony Canale. (Defendant's Reply brief, pp. 5, 22).

In its reply brief, defendant cites a chart comparing Canale's qualifications with those of plaintiff. (*See* Defendant's reply brief, p. 22; Defendant's Exhibit Y). In a later pleading styled, "Corrections and Supplemental Record Citations to the Memorandum of Law of Rheem Manufacturing Company in Reply to Plaintiff's Opposition Brief and in Further Support of its Motion for Summary Judgment," (Doc. # 58), Rheem cites the supplemental affidavit of John Blanz (Defendant's Exhibit PP), and the affidavit of Peter Reynolds (Defendant's Exhibit YY) as evidence of Canale's qualifications. (Corrections, etc. at ¶ 7). In his supplemental affidavit, Blanz states only that the comparison chart (Exhibit Y) accurately reflects information contained in Canale's personnel file. (Blanz supplemental aff., ¶ 2). Reynolds, Rheem's Director of International Markets, states that Canale was "clearly the most qualified internal candidate" for the position. (Reynolds aff., ¶ 3). Reynolds also states that "when evaluating primary candidates for the position of International Marketing Manager, four primary requirements come to mind[.]" (*Id.* at ¶ 4.) He lists these require-

ments as detailed product knowledge and technical aptitude, sales management experience, international market experience, and financial knowledge. (*Id.*). Reynolds explains why Canale was well-qualified for the job in each of these areas. (*Id.*). However, Reynolds does not indicate which, if any, of these requirements are mandatory, nor does he state that plaintiff did not meet the minimum requirements for the position. He states, instead, that he "cannot speak to the specific qualifications (or lack thereof) of Ms. Burney...." (*Id.*, at ¶ 2).

■ As noted above, plaintiff need not establish that she was the most qualified person for the position to establish a *prima facie* case—it is sufficient if she presents evidence that she was minimally qualified. *See Walker, supra,* 158 F.3d at 1193. While defendant has produced evidence tending to show that Canale was more qualified for the position, defendant has not demonstrated through evidence of record that plaintiff did not meet the minimum requirements for the position. Thus, the burden has not shifted to plaintiff to demonstrate that she was qualified for the position. *See Clark v. Coats Clark,* 929 F.2d 604, 608 (11th Cir.1991)("The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."); *see also, Jones v. City of Columbus, Georgia,* 120 F.3d 248, 253–54 (11th Cir. 1997). Accordingly, defendant is not entitled to summary judgment on the basis of its argument that plaintiff cannot establish a *prima facie* case with respect to this position.

■ Without discussing any evidence specific to this position, Rheem argues generally that it has articulated legitimate reasons for its decisions "which are based on objective qualifications for certain positions including, relevant experience and education and demonstrated performance." (Defendant's

---

15. Plaintiff has not raised any issue of equitable tolling or continuing violation in response to defendant's contention that this promotion claim is time-barred. Plaintiff bears the burden of establishing the satisfaction of conditions precedent to a Title VII action, where the defendant has appropriately denied the satisfaction of those preconditions. *Jackson v. Seaboard Coast Line Railroad Company,* 678 F.2d 992, 1010 (11th Cir.1982). Rheem has challenged the timeliness of plaintiff's EEOC charge both in its answer and in the present motion. (*See* Answer, ¶ 2; Defendant's Reply Brief, pp. 5, 22 n. 10).

reply brief, p. 26). While defendant's burden of articulating a legitimate, non-discriminatory reason for a particular decision is light, defendant must present evidence that the decisionmaker actually relied on the reason advanced. *Walker, supra,* 158 F.3d at 1181 n. 8 ("The defendant cannot testify in abstract terms as to what might have motivated the decision-maker; it must present specific evidence regarding the decision-maker's actual motivations with regard to each challenged employment decision. Likewise, a court may not assume, based on its own perusal of the record, that the decision-maker in a particular case was motivated by a legitimate reason when the defendant has offered none."). Defendant has not offered evidence indicating who made the decision to select Canale for the International Sales Manager position. Reynolds states that he "took over International operations in 1997," and that Canale was then "acting International Marketing Manager." (Reynolds aff., ¶ 1). Plaintiff left her employment with defendant in 1996. (*See* Defendant's Exhibit J). Reynolds does not inform the court what position he held prior to 1997, nor does he testify that he made the decision to select Canale for the position. Additionally, he does not indicate whether plaintiff was even considered for the job. He states, "While I cannot speak to the specific qualifications (or lack thereof) of Ms. Burney, I was of the opinion that Ms. Burney did not exhibit a quality work ethic required for any personnel under my supervision." (Reynolds aff., ¶ 2). Again, however, Reynolds does not state that he made the decision at issue, and he does not say that his opinion regarding plaintiff's work ethic was the basis of any particular employment decision.

Defendant has not carried its burden of demonstrating that there are no genuine issues of material fact and, accordingly, defendant is not entitled to summary judgment with respect to this position.

### Hostile Environment Claim

Defendant argues that it is entitled to summary judgment on plaintiff's hostile environment sexual harassment claim because: (1) defendant had no actual knowledge of the harassment during plaintiff's employment be-cause plaintiff failed to report it to "higher management"; (2) defendant had no constructive knowledge of the harassment because (a) it was not pervasive enough that Rheem should have known of the harassment and (b) plaintiff failed to report the harassment pursuant to Rheem's valid, effective and well-disseminated policy; (3) defendant took prompt remedial action the day after plaintiff complained of harassment, and plaintiff resigned before defendant could take further remedial action; and (4) plaintiff has failed to allege sufficient facts to establish a hostile environment (Defendant's brief, pp. 70–76).

### Discovery Sanctions

Before the court reaches the merits of the hostile environment claim, it must determine whether it will exclude evidence as a sanction for plaintiff's failure to make adequate initial disclosures as required by the court's scheduling order. In conjunction with its motion to strike plaintiff's amended complaint, defendant sought an order excluding "all testimony for all purposes including summary judgment and trial as such testimony would relate to Plaintiff's claim of *quid pro quo* sexual harassment by Rheem employee Jerry Colburn." (Doc. # 24, p. 18; Doc. # 23, pp. 2–3). In the present motion for summary judgment, defendant further argues that plaintiff's evidence as to other alleged harassers should be excluded for plaintiff's failure to properly disclose the evidence. (Defendant's Reply Brief, pp. 61–62).

A Uniform Scheduling Order was entered in this case pursuant to Fed.R.Civ.P. 16 on October 1, 1997. The order required the parties to

[p]rovide to other parties the name and, if known, the address and telephone number of each individual believed by it to have discoverable, non-privileged personal knowledge concerning any significant factual issue in the case, appropriately indicating the subjects about which the person has such knowledge.

The order provided that the parties "should make [their] initial disclosures based on the information then reasonably available to [them]," and noted that the

disclosures "are subject to a duty of supplementation within 14 days of when a party learns that in some material respect the information disclosed is incomplete or incorrect ...." Plaintiff's initial disclosures on October 22, 1997 listed only seven individuals as having "discoverable, non-privileged personal knowledge concerning significant factual issues in this case"; plaintiff, Pattie McKenzie, Anita Kuhlman, Andrew Krantz, Scott Martin, John Blanz, and Drenda Patterson. (Defendant's Exhibit C). As to all of these individuals, the initial disclosure did not "indicate the subjects about which the person has such knowledge" as required by the scheduling order.

On November 20, 1997, plaintiff served her responses to defendant's first interrogatories. (Defendant's Exhibit V). Those interrogatories included very specific questions concerning sexual harassment which asked for names, descriptions of behavior, dates, and other details. In interrogatory # 9, plaintiff was asked to:

Describe each and every instance of which you are aware which would factually support your allegation that male employees of Rheem exhibited conduct that constituted sexual harassment or created a hostile working environment towards you or any female, and in your complete description of each such occurrence, please include: (1) the conduct, words or action which you allege was improper; (b) the identity of the alleged perpetrator or perpetrators; (c) the date or approximate date of the alleged instance or occurrence; (d) whether you observed the harassment or, if not, how you learned of it; (e) the names of any witnesses to each alleged instance or occurrence; (f) the role played by each harasser; (g) the female victim or victims toward whom the harassment was directed; (h) the person to whom the harassment was reported and the person who reported it, and (i) the corrective action taken by Rheem.

(Defendant's Exhibit V, p. 5).

Plaintiff responded:

It is not reasonably possible to list each and every instance of discriminatory conduct since this is a hostile environment case. However, the conduct in question includes the following: The Defendant's failure to address complaints made by the Plaintiff and other females concerning sexually demeaning comments, jokes, and actions; the exclusion of female employees from social gatherings; the Defendant's treatment toward Runo Anderson; some of upper management's generally unprofessional behavior with females at trade shows and elsewhere; vicious and unfounded rumors generated by the Defendant's male management team about the Plaintiff and reported to employees and customers

*Id.*

In interrogatory # 19, plaintiff was asked to:

Describe each and every instance in which you were exposed to a discriminatory or harassing environment by any male Rheem employee, agent or customer on the basis of your sex an[d] include: (a) the name of the male(s); (b) the precise nature of the harassment or discriminatory environment; (c) the date or approximate date of each alleged instance or occurrence; (d) the names of any witnesses to the alleged instance or occurrence; (e) the person to whom the conduct was reported and the person who reported it, and; (f) the response of Rheem to the report(s).

*Id.*, p. 9. In response, plaintiff referred to her responses to interrogatories # 8 and # 9. Her response to # 9 is set forth above. Plaintiff's response to # 8, which sought details about males in management who exhibited discriminatory conduct towards her or any female on the basis of gender, was:

It is not reasonably possible to list each and every instance of discriminatory conduct since this is a hostile environment case. However the conduct in question includes the following: The Defendant's male management's failure to address the complaints and concerns about sex discrimination and sexual harassment that were brought to its attention; the hiring of Scott Martin to fill the position of Director of Marketing; the objectives and training that the Plaintiff was required to complete

before the question of whether she would be considered for promotion would be revisited and Scott Martin's subsequent denial of the same; the added responsibilities the Plaintiff was given without any corresponding recognition, including, financial compensation and/or job title; the Defendant's refusal to promote the Plaintiff to the position of Sales Promotion Manager, even though that job title and classification remained open and available; the Defendant's failure to consider the Plaintiff for the position of Director of Marketing that was never posted as available to anyone; the Defendant's refusal to promote the Plaintiff to the position of Assistant Residential Product Manager; the promotions of among others. Chuck Rohde, David Martin and Frank Putz; the career advancement of males as compared to females at Rheem; the lack of any kind of sensitivity training concerning sex discrimination, sexual harassment or work place diversity.

*Id.*, p. 4–5.

Interrogatory # 21 asked plaintiff to identify all facts supporting her constructive discharge allegations, including the "precise events"; whether, when and to whom the events were reported; and all persons accused of contributing to the constructive discharge. (*Id.*, p. 10). Plaintiff responded, "It is not reasonably possible to list all facts which support Plaintiff's allegation of constructive discharge because there were too many. Please see responses above regarding the hostile environment." (*Id.*). Interrogatory # 30 asked plaintiff to identify every instance in which she notified management at Rheem of sexually harassing conduct. (*Id.* at p. 12). Plaintiff responded, "It is not reasonably possible to list each and every instance in which the Plaintiff notified management; however the members of management Plaintiff did notify include but are not limited to the following: John Blanz, Doug Smith, Jerry Colburn, Scott Martin, Andy Krantz and Tom Spencer." (*Id.*). Although she did not sign the interrogatories, plaintiff saw a copy of them before they were served. (Tran-

script of Nov. 6–9, 1998 evidentiary hearing, p. 280).

Plaintiff's deposition was conducted over a period of three days—December 10, 1997 and January 6–7, 1998. (*See* Plaintiff's Exhibits 2–4). The dispositive motion deadline expired nine days after conclusion of the deposition. (Doc. # 9). In her deposition, plaintiff testified concerning a number of specific incidents which formed the basis of her sexual harassment claim, including incidents involving people who were not identified to defendant in accordance with Section 2(A) of the court's Rule 16 scheduling order. In opposition to the present motion for summary judgment on her hostile environment claim, plaintiff now seeks to use evidence regarding the following incidents (*see* plaintiff's brief, pp. 26–33):

1. In 1993, plaintiff happened to be standing beside the facsimile machine when an "inappropriate cartoon fax came through," which was addressed to Colburn. Doug Smith was right behind plaintiff. She handed him the fax and said, "Doug, this is sexual harassment." Smith apologized to plaintiff and told her he would handle it. Plaintiff received a letter of apology from Colburn. (Burney depo., pp. 187–88).

2. At a dinner at a leadership conference in 1994, Stu Farwell, Rheem's President and General Manager, referred to plaintiff's department as "Mr. Krantz and gals." (*See* Burney depo., pp. 620–25; McKenzie depo., pp. 264–65; Plaintiff's Exhibit 26).

3. At the same conference, Glen Berens, then Rheem's Vice President–Controller (*see* Plaintiff's Exhibit 25) told plaintiff in front of a group of three or four male managers that he wanted to see her in her bathing suit and asked her if she had brought one. (Burney depo., pp. 582–84).

4. On one occasion in 1994 when the male managers in the Marketing department were going to be away, Frank Putz [16] remarked to the women in the advertising department (plaintiff, Huntsberry, and McKenzie), "Who am I going to get to watch you girls tomorrow? Oh, I know.

---

**16.** Putz was Rheem's Director of Customer Service. (*See* Plaintiff's Exhibit 24).

Alan Cape. He can do it." At that time, Cape been in the department for about one month. Plaintiff believed that Putz meant that "there had to be a male there to watch us girls in order to do our jobs effectively." (Burney depo., pp. 673–75).

5. Putz constantly screamed out comments in the advertising hallways directed toward women, such as, "Burney you never do anything except stand by the fax." Such comments were not directed to males. (Burney depo., p. 675).

6. Putz told Sylvia Martin[17], "You're depressed because you're a woman." The comment upset Martin to the point of tears. Plaintiff spoke with Martin when she saw that Martin was upset, and Martin told plaintiff about the comment. (Burney depo., p. 636).

7. Tom Spencer, defendant's Vice President of Marketing, asked plaintiff why she didn't just get married and settle down. (Burney depo., pp. 637–38).

8. Plaintiff met with senior managers and made a proposal to the plant manager, Wayne Bandur, about sponsoring a Winston Cup car. Bandur told plaintiff that Spencer had remarked, "Are you out of your mind? She is just a girl. She doesn't know what she is talking about." When plaintiff confronted Spencer about the remark, he did not deny it. (Burney depo., pp. 782–84).

9. As plaintiff turned around to leave a meeting with her supervisor, Krantz, he stared at her "behind" and said, "this is a very, attractive outfit" in a demeaning, degrading tone. (Burney depo., pp. 189–90).

10. Sherry Bradley was a secretary in the Advertising/Marketing department from 1991 until sometime in 1993. One day while Bradley was standing near her desk talking with Doug Smith (Marketing Support Manager), Sherrill Bennington (another secretary) and possibly Ray Liebig (Pricing Manager). Krantz walked by and stopped in front of the group. He cocked his head back, leered at Bradley's chest, and said, "Nice tits" in an exaggerated drawl. Smith chuckled under his breath. (Bradley aff., ¶¶ 1, 3).

11. When plaintiff was walking into work one morning, Jack Banker told her to turn around and bend over facing Banker and Dave Hanning. Hanning laughed, and both Banker and Hanning leered at plaintiff, looking her up and down. Plaintiff believed they wanted to see her cleavage, and worried that her outfit was cut too low. Banker told her he really liked her outfit. (Burney depo., pp. 577–80).[18]

12. On another occasion in 1995 or 1996, Hanning told plaintiff he liked her outfit, but he indicated that the lace on her blouse should start up at her neck rather than down on her thigh. (Burney depo., pp. 580–82, 586).

13. Plaintiff heard Putz, Colburn and David Martin constantly use the phrase "stupid bitches" as they walked through the "advertising community area." Plaintiff does not know who they were referring to. (Burney depo., pp. 990–91).

14. Putz openly called Sherry Bradley "ding bat" around the office. (Bradley aff., ¶ 8).

15. In July 1996, Mark Adams said (in front of plaintiff), that he had advised a manager at Southern Pipe & Supply Company that the only way to avoid sexual harassment problems is to avoid hiring women and keeping them out of the industry. (Burney depo., pp. 801–03).

---

**17.** Sylvia Martin was plaintiff's secretary from 1993 to 1996. Martin also worked for others in the Marketing Department. (Martin aff.).

**18.** Plaintiff testified that this incident occurred in 1996 or, possibly, in 1995. (Burney depo., p. 586). In 1995 and 1996, Hanning was Rheem's Commercial Product Manager, and in 1996, Banker was Rheem's National Sales Manager for Commercial Products or the Region Customer Development Manager. (*See* Organizational Chart attached to Plaintiff's Exhibit 50; Plaintiff's Exhibits 24, 26). In her brief, plaintiff asserts that "when Mr. Banker was relocating to Montgomery and learned the Plaintiff had a house with several bed rooms [sic], he told Mr. Colburn 'why don't I just offer her (Plaintiff) all the room and board and all the orgasms that she can handle?'" (Plaintiff's brief, p. 29). Plaintiff cites her deposition testimony at page 650. Page 650 of the deposition includes no such testimony. The court has not noted the testimony elsewhere in its review of the record.

16. "Early on," plaintiff told Colburn that Runo Andersen had commented to her about her "cute little waist." Plaintiff was offended that Andersen was later honored at a sales banquet, "given his past history with Rheem." (Burney depo., pp. 191–93).

17. On one occasion when plaintiff was out of town, Krantz climbed up onto a table adjacent to Martin's desk. He was on all fours and raised one of his legs toward Martin's face. Martin asked him, "Have I done something to offend you?" Krantz didn't respond. Boyd Wilson and Patty McKenzie witnessed the incident. Wilson told Billingsley, who was investigating the incident, that he was embarrassed for Martin. Burney heard about the incident the day she returned to work. (Billingsley depo., pp. 165–67; Burney depo., p. 625–26). Blanz met with Krantz on May 4, 1995 about the incident. Krantz claimed he had been trying to do a headstand. After Krantz left Blanz' office, he called Martin and McKenzie into his office and became upset—he was red in the face, his hands and arms were shaking, and his eyes were glazed over. McKenzie and Martin reported to Blanz that Krantz scared them, and that they became concerned he might hurt them. (Blanz depo., pp. 480, 482–83, 485–87; Plaintiff's Exhibit 30).

Additionally, citing her deposition testimony, plaintiff argues that Colburn made so many sexually harassing comments to her that she "blocked them out," that he told her that he wanted to make love to her, that he wanted to have an affair with her, that he was willing to leave his wife for her, that the only instrument he would like to know how to play was she, and that she had the "greatest ass" he'd ever seen. Plaintiff further argues that Colburn often remarked about how sexy she looked and suggested that they go to a hotel, that he made crude comments "which included the 'f' word and the word 'bitch,'" that he referred to his male anatomy as "Mr. Big," and that he remarked that another female employee's "feet had been up in the air so much that the soles of her feet are suntan." According to plaintiff, Colburn

made sure that she attended out of town trade shows with her, and that he used customer functions as a way to spend more time with her. Colburn gave her thirteen red roses with one rose standing above the rest, with a card stating that he cared about her above all the rest. He attempted to kiss her several times despite her repeated requests for him to stop and, at a show in Orlando in May 1996, he kissed her and "held her so forcibly over her objection" that she thought she was going to be raped. (Plaintiff's brief, pp. 29–36)(citing Burney depo., pp. 132, 136–38, 143–44, 219, 227–29, 233–37, 241, 251–53, 296, 590–91, 614–15, 652, 655–58).

In other portions of her opposition brief and in her reply brief, plaintiff has also noted the following evidence:

18. When plaintiff met with Blanz on August 21, 1996 and Complained about sexual harassment, he told her, "If you looked like Patty McKenzie or Mary Nell Pecot, you wouldn't have any sexual harassment problems." (Burney depo., p. 406, 409–10).

19. In May of 1996, McKenzie attended a meeting organized by Rheem for its independent agents. The agents were divided into groups and asked to respond to the question of what their expectations were from Rheem as a manufacturer. Each group had an individual present the group's issues to the attendees. Runo Anderson presented a chart entitled "Mfg. Expectations." Drawn on the chart were a dollar sign ($) martini glass, golf club and the symbol for female ( ♀ ). Anderson said, "[T]his is what we expect from Rheem: Money, . . . alcohol, golf and women." McKenzie was offended. (McKenzie depo., pp. 132–33, 135–37; Plaintiff's Exhibit 49 (chart)).

20. Kuhlman complained to Billingsley (human resources administrator) [19] that males were "always making jokes about [Kuhlman] having PMS and so forth." (Billingsley depo., p. 194). Kuhlman does not recall a specific instance of someone remarking to her about having PMS. (Kuhlman depo., p. 133).

**19.** *See* Plaintiff's Exhibit 25.

21. In 1993, Kuhlman was placed in a position entitled "export administrator." The man who held it before Kuhlman had a title of "manager, export and tank accounts." Kuhlman was upset and complained to Billingsley and "everybody who walked past." (Kuhlman depo., pp. 102–03, 106–08, 110–11; Billingsley depo., pp. 194–95, 197).

22. Sometime in 1993, Kuhlman found an "ad" in her mail slot for a "breast enlargement clinic." The envelope read "Bigger Boobs Are Our Business." It had women's breasts drawn on it. Kuhlman did not know who gave it to her. She thought it was funny and kept it to use later as a practical joke. When Kuhlman, plaintiff and McKenzie met with Birchfield, an attorney, about gender discrimination, however, Kuhlman took the ad with her. (Kuhlman depo., pp. 19–20).

23. On one occasion when Kuhlman was in someone's office, Tom Spencer, the Vice President of Marketing was standing in the office. Kuhlman looked over and saw that Spencer had his hand down the front of his trousers, adjusting his insulin pump. Kuhlman asked him what he was doing. He said, "Oh, I didn't know that you were looking," and continued adjusting the medication. Kuhlman did not consider the action to be sexual harassment, but thought Spencer had exhibited a lack of social grace. Kuhlman believed he should have adjusted the pump in the men's room rather than in front of Kuhlman. (Kuhlman depo., pp. 23–24).

24. Plaintiff testified that Kuhlman told her about an incident where Hanning was "constantly touching Anita," around her "neck and shoulder area" and Kuhlman "would scream, ['p]lease stop touching me, I don't want you touching me, quit touching me['] over and over again," and that he did not stop right away. Plaintiff testified that she did not know how many times this happened, but that this "continual touching" could have been one time. (Burney depo., pp. 638–39).

25. Putz frequently made comments in front of other managers to Kuhlman about whether she was wearing a bra. He would say either "I see you are wearing a bra today," or "You are not wearing a bra today," Kuhlman did not feel harassed by the comments, but complained because "it just got old after a while." Kuhlman never told plaintiff about Putz' "bra" comments, but plaintiff "could have heard" the comments because sometimes they were made while Kuhlman was in the hallway. (Kuhlman depo., pp. 129–32, 200).

26. Blanz testified that in 1990 he spoke with Lorraine Lamburski, who told him that Lisa Whittington, then an ex-Rheem employee, had called Lamburski to complain that Runo Anderson was calling her at home and bothering her, despite her repeated requests that he stop calling. Anderson was then Vice–President of Sales. Blanz spoke with Whittington on March 15, 1990 and Whittington stated that Anderson had told Whittington that even if she complained to the company about his calls, no one would believe her anyway. Whittington told Blanz that she left Rheem's employ because of Anderson's actions, and that she "decided to quit rather than tell the company of the problem because [she] felt the other people in the office, which are his friends as well as mine, might misunderstand and feel [she] wasn't mature enough to handle the situation." She reported that Anderson frequently came to her office to flirt with her, that he asked her to go to a hotel with him and that he was constantly "hitting on her and trying to move in." He implied that if she did not "cooperate" he could use his influence to affect her employment. When Rheem investigated Whittington's complaint, Anderson told Blanz that he and Whittington had a consensual affair, that she asked him to give her $3,000.00 and, when he refused, she threatened to tell his wife about the affair. Anderson also told Blanz that Whittington had a drinking problem and that she had complained to Rheem because she was angry about the money. (Blanz depo., pp. 306–08, 310–12, 316–18, 321–27). Plaintiff testified that it was "common knowledge" in Marketing that Anderson had to leave Rheem because he had an affair, and that he was given a big party when he left. After he left and

became an agent, he was awarded the "Richmond retail contract." (Burney depo., pp. 588–90). In her affidavit, plaintiff states, "Shortly after coming on board, I learned of the Runo Anderson/Lisa Whittington affair where he, a Vice–President [,] used his position to gain sex from a female. When she quit and complained she was vilified. Mr. Anderson, however, continued on at the company and continued to harass." (Burney aff., ¶ 15).

27. Plaintiff met with Blanz on August 21, 1996 and complained about rumors that were circulating about her: (1) that during a customer outing at Talladega, she indicated that she was going to take her top off; (2) that Mike Juhnke had reported that she appeared to be intoxicated in the parking lot; (3) that she and Colburn were having an affair; and (4) that Banker had informed other employees that plaintiff had done a poor job at a trade show. (Blanz depo., pp. 730–31). Plaintiff disputed the substance of the rumors. (*See* Burney aff., ¶¶ 27, 28, 41; Blanz aff., ¶ 2).

28. Plaintiff testified that Milt Roberts, a Rheem employee who worked on computers, "would always come up very, very close to [her]," that it made her uncomfortable, and that, on one occasion, he put his arm around her and rubbed her shoulder. Plaintiff closed the door and spoke with Roberts. She told Roberts, "Don't do it again," and "it stopped." Plaintiff reported the incident to Krantz and told him that as far as she knew, the problem was resolved. (Burney depo., pp. 242, 246–48).

29. Plaintiff's predecessor, Kristen Carter, trained plaintiff briefly at the beginning of plaintiff's employment. At lunch one day, plaintiff asked Carter if she had been subjected to sexual harassment.

Carter told plaintiff about an incident in which two Rheem customers taped her hands behind her back with duct tape. Later, the two customers, Jim Matthews and John Edwards, told plaintiff they had done the taping. (Burney aff., ¶ 6; Burney depo., pp. 138–40).

As noted above, the Rule 16 scheduling order in this case required plaintiff to list, based on the information then reasonably available to her, "each individual believed by [her] to have discoverable, non-privileged personal knowledge concerning any significant factual issue in the case, appropriately indicating the subjects about which the person has such knowledge." (Order, 10/1/97, § 2). Again, plaintiff listed only herself and six others—McKenzie, Kuhlman, Krantz, Martin, Blanz, and Patterson—with no indication of the subject of their knowledge. (*Defendant's Exhibit U*). It is clear from the evidence which plaintiff now seeks to use that her initial disclosure was woefully inadequate. Had plaintiff merely omitted a few individuals who had knowledge of minor incidents, the court might have concluded that the omissions were inadvertent. However, plaintiff failed to include nearly all of the people she now claims were responsible for the sexually hostile environment and constructive discharge for which she seeks a remedy, including the man she has described as "the major contributor to [her] sexual harassment." (Burney depo., p. 729).[20] Additionally, the court is persuaded by the continued evasiveness demonstrated in plaintiff's interrogatory responses that her failure to comply with the court's order requiring the initial disclosures was not the product of inadvertence, but instead of a deliberate, conscious choice and plaintiff's flagrant disregard for her obligations under the order.[21] When plaintiff was given a clear opportunity

---

**20.** The court previously concluded after a hearing that plaintiff had deliberately concealed information regarding her claims involving Colburn from the EEOC and others, and found that the omission of Colburn's name from the initial disclosure was due to plaintiff's failure to advise her counsel of the alleged harassment by Colburn. (*See* Order, 6/30/99; *id.*, p. 16 n. 13).

**21.** Defendant's counsel assert in their brief that they wrote to plaintiff's counsel the day after receiving the deficient initial disclosure pointing

out that the disclosures lacked the required subject matter of the witnesses' knowledge and requesting immediate compliance. They claim that plaintiff's counsel ignored this letter and a follow-up letter: (Defendant's Brief, p. 29). The letters are not properly before the court on this motion for sanctions and for summary judgment. While defendant did file them at the hearing on its motion to strike plaintiff's amended complaint (Exhibits 21, 22), the court has not considered them on the present motion.

to correct the omissions in her initial disclosure by properly responding to interrogatories—and in the face of an obligation to do so under Rule 33(b)(1)—she declined to remedy the situation and, instead, persisted in failing to provide required information.[22]

The parties apparently agree that the rule applicable to sanctions in the circumstances before the court is Rule 37(c). Rule 37(c) provides, in part: "A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1) shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed.R.Civ.P. 37(c)(1). Rule 26(a) sets forth the requirement for initial disclosures, and Rule 26(e)(1) pertains to a party's duty to supplement incomplete or incorrect disclosures made pursuant to Rule 26(a). However, the Middle District of Alabama has exercised its discretion not to implement Rule 26(a)(1) of the Federal Rules of Civil Procedure, the initial disclosure provision. (*See* General Order entered December 1, 1993 (superseded by General Order entered October 24, 1997, Civil Misc. No. 2053)). Instead, this court has chosen to require initial disclosures through uniform Rule 16 scheduling orders.[23] Thus, Rule 37(c) does not apply, on its terms, to the facts before the court.

Rule 16(b) of the Federal Rules of Civil Procedure provides for entry of a scheduling order. Rule 16(f) explicitly provides for sanctions for failure to comply with such an order. The Rule states that "if a party or party's attorney fails to obey a scheduling ... order ..., the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), or (D)." Fed.R.Civ.P. 16(f). Rule 37(b)(2)(B) provides for an order prohibiting a party from introducing matters in evidence. Thus, the applicable sanction provision, Rule 16(f), permits the court to impose the same sanction set forth in Rule 37(c), *i.e.*, exclusion of evidence.[24]

While Rule 37(c) is not technically applicable, it is directed to the same conduct at issue in the present case—failure to comply with an initial disclosure requirement—and is an indication that the drafters of the Federal Rules intended that courts not take such conduct lightly.[25] Application of the standards of Rule 37(c) by analogy in resolving the sanction issue before the court is appropriate.[26] *See Snow v. Bellamy Mfg. & Repair,* 1995 WL 902210, *4 (N.D.Ga. 1995)("[T]he Local [Rule] requirement that certain disclosures should be automatic is analogous to that of Federal Rule 26. The Court finds that Rule 37(c) sanctions would provide an appropriate remedy for violations

---

22. The court does not read defendant's motion to seek sanctions against plaintiff for her failure to answer its interrogatories adequately. (*See* Defendant's reply brief, p. 61–62). To the extent that it does, such a motion is due to be denied. Absent an order directing more detailed responses to the interrogatories, a sanction under Rule 37(b) is inappropriate. *See 7 Moore's Federal Practice* § 37.42 (3d ed.). The court here considers plaintiff's incomplete responses to the interrogatories only as evidence of a continued pattern of disregard for her disclosure and discovery obligations.

23. Initial disclosures are now also mandated by local rule. *See* LR 26.1(a)(1).

24. The rule also permits more severe sanctions, including dismissal of the action. *See* Rule 37(b)(2)(C), incorporated as a permissible sanction by Rule 16(f).

25. The Advisory Committee Notes for the 1993 revision of Rule 37(c) state:

The revision provides a self-executing sanction for failure to make a disclosure required by rule 26(a), without the need for a motion under subdivision (a)(2)(A).
Paragraph (1) prevents a party from using as evidence any witnesses or information that without substantial justification, has not been disclosed as required by Rules 26(a) and 26(e)(1). This automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56.
Advisory Committee Notes, Rule 37(c)(1993 Amendments).

26. The parties are not prejudiced by application of this rule by analogy, as neither party has argued that Rule 37(c) is inapplicable, and both have argued the sanction issue in terms of the Rule 37(c) standard.

of required disclosure under Local Rules. Thus, the Court will apply Rule 37(c) sanctions by analogy for violations of Local Rules.").

"It is well-established that Fed.R.Civ.P. 37(c)(1), enacted in 1993, mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified." *Vance v. United States*, 182 F.3d 920, 1999 WL 455435, *3 (6th Cir.1999)(unpublished decision) (citation and footnote omitted). "The new rule is mandatory: a party that fails to make the required disclosures shall not, unless such failure is harmless, be permitted to use [undisclosed] evidence at a trial."[27] *Klonoski v. Mahlab*, 156 F.3d 255, 269 (1st Cir.1998). "To be sure, the rule somewhat tempers this mandate by permitting courts to excuse failures to disclose to some degree (i.e., to impose other sanctions 'in lieu of this sanction'). Fed. R.Civ.P. 37(c)(1). But the new rule clearly contemplates stricter adherence to discovery requirements, and harsher sanctions for breaches of this rule, and the required sanction in the ordinary case is mandatory preclusion." *Id.* (footnote omitted).

■ Plaintiff does not argue that she complied with the disclosure requirements of the Rule 16 order. (*See* Plaintiff's surreply brief, pp. 14–16).[28] Instead, she argues that the non-disclosure was both substantially justified and harmless. (*Id.*).[29] As to substantial justification, plaintiff argues that her "efforts to comply with the initial disclosures . . . have been hampered by the accelerated nature of the deadlines in this case." *Id.*, p. 14. However, the scheduling order in this case was not entered until over a month after plaintiff filed this action. The order is a uniform order used in this district which allowed the parties 21 days from entry of the order to make the required initial disclo-

sures. The order also allowed the parties to file objections to the deadlines established by the order within 14 days. (*See* Order, 10/1/97, § 14). Although the parties filed a joint objection to the uniform scheduling order, they did not seek an extension of the deadline for the initial disclosures. Instead, the objection of the parties was directed to the trial setting and associated deadlines. (*See* Doc. # 6). Additionally, the disclosure was to be based on "information then reasonably available to [the party]." (Scheduling Order, § 2). The information here at issue was within plaintiff's knowledge at the time that disclosures were due. The court's requirement that plaintiff disclose information within her knowledge within 21 days was hardly onerous.

■ "Substantial justification requires justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request. The proponent's position must have a reasonable basis in law and fact. The test is satisfied if there exists a genuine dispute concerning compliance." *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 680 (D.Kan.1995)(citing *Pierce v. Underwood*, 487 U.S. 552, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). The court's "accelerated . . . deadlines" do not provide substantial justification for plaintiff's failure to provide a complete initial disclosure. To the extent that plaintiff argues that she had insufficient time to supplement the response because of the busy discovery schedule, the court likewise finds this argument to be without merit. Again, the matters at issue were within plaintiff's knowledge, no motion to extend this deadline was filed, and supplemental disclosures could have been provided without a great investment of time. Further, any need to supplement arose only by virtue of plaintiff's failure

---

**27.** The same language pertains to evidence on a motion. Fed.R.Civ.P. 37(c)(1).

**28.** In resolving this issue, the court has also considered the arguments set forth by plaintiff in her response, filed December 1, 1999, in Rheem's motion in limine. (*See* Doc. # 116).

**29.** Plaintiff assumes that the defendant bears the burden of demonstrating that it has been harmed

by the non-disclosure. *See* Doc. # 116, p. 5. Plaintiff is mistaken. Under Rule 37, the burden of establishing that non-disclosure is substantially justified or harmless is on the party who failed to disclose the information. *See Finley v. Marathon Oil Company*, 75 F.3d 1225, 1230 (7th Cir. 1996)("The sanction of exclusion is thus automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.").

to comply with her disclosure obligations in the first instance. Thus, the court concludes that plaintiff has not established "substantial justification" for her non-disclosure.

With regard to whether her omission was harmless, plaintiff argues that this is a case of late disclosure rather than non-disclosure, that "graphically detailed evidence regarding Plaintiff's hostile environment claim" was disclosed during plaintiff's deposition, which commenced less than six weeks after the initial disclosures were due, and almost one month elapsed between the first day of plaintiff's deposition and the resumption of her deposition.[30] (Plaintiff's response to motion in limine, p. 5; Plaintiff's surreply brief, p. 16). The Advisory Committee Note to the 1993 amendment to Rule 37(c) gives examples of "harmless" violations: "*e.g.*, the inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties; the failure to list as a trial witness a person so listed by another party ..." Advisory Committee Notes, Rule 37(c)(1993 Amendments). "This commentary strongly suggests that 'harmless' involves an honest mistake on the part of a party coupled with sufficient knowledge on the part of the other party." *Vance, supra*, 182 F.3d 920, 1999 WL 455435 at * 5. Here, plaintiff has shown neither an honest mistake nor knowledge on the part of defendant of the involvement of the individuals whom she failed to disclose.

■ Because of plaintiff's failure to comply with the Rule 16 disclosure and supplementation requirement, defendant was deprived of any meaningful opportunity to investigate plaintiff's allegations prior to he deposition on December 10, 1997. Additionally, it appears that many of the instances of harassment now complained of

by plaintiff were not disclosed to defendant until plaintiff's deposition on January 6–7, 1998, a mere nine or ten days prior to the deadline for defendant's summary judgment motion. Under these circumstances, the court—with one exception [31]—cannot find that the instances of plaintiff's non-disclosure were "harmless." Accordingly, the court concludes that it is compelled to sanction plaintiff for her omission.

Plaintiff failed to indicate the subject matter of the knowledge of those individuals whom she did list in her initial disclosure. In view of her failure to correct this omission by properly responding to defendant's interrogatories, the court would be justified in excluding even the evidence involving the listed individuals. However, the court will temper its sanction by excluding only evidence as to which plaintiff's omission disadvantaged defendant in preparing for plaintiff's deposition and/or the present motion for summary judgment, which closely followed the conclusion of plaintiff's deposition.

Rather than reiterate the evidence on which plaintiff relies to support her hostile environment claim, the court will refer to the evidence as it is numbered above. The court will exclude, for purposes of this motion, the following testimony and evidence.

First, evidence of harassment by those harassers who were not revealed until plaintiff's deposition resumed in January, and who either were not identified as having discoverable information in the initial disclosure and/or the incidents described were not witnessed (at least insofar as the court is able to determine from the record) by anyone so listed,[32] is excluded. This evidence consists of:

# 3—Berens swimsuit comment (Burney depo., pp. 582–84).

---

30. The latter cuts both ways. The four-week hiatus gave plaintiff a further opportunity to supplement her previous disclosure. Her failure to do so evidences her continued disregard for her obligations under the order.

31. The single exception is plaintiff's evidence regarding the inappropriate cartoon she picked up off of the facsimile machine in 1993. According to defendant, Colburn's apology letter to plaintiff regarding the cartoon was provided to defendant on either November 1, 1997 or December 2,

1997 as part of her initial document disclosure. Although this disclosure was untimely, defendant was advised of the incident prior to plaintiff's deposition. (*See* Defendant's brief in support of motion in limine, p. 10 and n. 8).

32. This excludes, of course, the plaintiff. Defendant could not have interviewed plaintiff to prepare for her deposition, even though plaintiff was listed on the initial disclosure.

#5—Putz screaming comments (Burney depo., p. 675). Putz was identified by name in plaintiff's response to interrogatories, but only with reference to his promotion. (Response to interrogatory #8).

#6—Putz comment to Martin that she was depressed because she is a woman (Burney depo., p. 636).

#7—Spencer marriage comment to plaintiff (Burney depo., pp. 637–38). Spencer was identified in plaintiff's response to interrogatories, but only as someone to whom plaintiff complained about sexually harassing conduct and/or discriminatory treatment.

#8—Spencer "just a girl" comment (Burney depo., pp. 782–84).

#11—Banker/Hanning "bend over" incident (Burney depo., pp. 577–80).

#12—Hanning lace blouse comment (Burney depo., pp. 580–82, 586).

#13—Putz and Martin "stupid bitches" comments (Burney depo., pp. 990–91). Martin was also identified in plaintiff's responses to interrogatories, but only with regard to his promotion.

#15—Mark Adams comment (Burney depo., pp. 801–03).

Second, although plaintiff did not cite this evidence in support of her hostile environment claim (*see* Plaintiff's brief, pp. 26–33), she has also introduced evidence that, at a customer outing at a restaurant in New Orleans, Putz talked in front of plaintiff about an incident in which he and a Las Vegas customer had driven around Las Vegas in a limousine with two lesbian prostitutes and paid the women to have sex in front of them. (Burney depo., pp. 418–19). This evidence is also excluded.

Third, the court will not permit plaintiff to introduce evidence regarding Colburn's discriminatory actions. The court has previously determined that plaintiff's decision to withhold information about Colburn until her deposition was a deliberate, strategic choice. Plaintiff argues that her late disclosure concerning Colburn was harmless because her deposition resumed nearly four weeks after defendant learned of the Colburn incidents. However, during that four week period, defendant was also required to prepare a response to plaintiff's motion for a protective order, filed December 10, 1997. Further, five days after the first day of her deposition, plaintiff filed a motion to amend her complaint to add a claim of *quid pro quo* harassment. The court granted this motion on December 17, 1997. This necessitated defendant's amended·answer, as well as preparation of an extensive motion to strike plaintiff's amended complaint based on plaintiff's failure to exhaust her administrative remedies, filed January 13, 1998—three days before the summary judgment deadline—which this court subsequently determined to be meritorious. In short, defendant had ample work to occupy its time during the break in plaintiff's deposition, in addition to investigating the newly-revealed claim. The court cannot conclude in these circumstances that the Colburn "bombshell" dropped by plaintiff in her deposition was "harmless." Further, the court has determined that plaintiff must be held accountable for her deliberate choice not to reveal harassment by Colburn.

Other than evidence relating to Colburn, the court will not exclude evidence of incidents about which plaintiff testified in the first day of her deposition. Additionally, the court will not exclude evidence of incidents witnessed by or known by individuals listed in plaintiff's disclosure (other than plaintiff)—even where the incident involves harassment by someone not disclosed—because defendant could arguably have learned of the incidents by interviewing the individuals listed.[33] Thus the court will not exclude plaintiff's evidence regarding the following incidents:

(1) On three or four occasions, and twice in plaintiff's presence, Banker told Patty McKenzie, "[Y]ou're the only one that I'll let handle my balls." (Burney depo., p. 615).[34]

---

**33.** The court does not intend to suggest that plaintiff's disclosure was adequate as to these individuals and/or incidents. It has determined only that it will not exclude the evidence as a sanction.

**34.** Plaintiff did not list this incident in support of her claims. However, the court noted the evidence in its review of the record.

(2) Incidents # 2, # 4, ## 18–29.

The court also will not exclude evidence regarding # 16 (Runo Anderson—"cute little waist" comment), as plaintiff arguably corrected her failure to list Anderson by a vague reference to him is response to interrogatory # 9 and by listing Colburn as someone to whom she complained about harassment.[35] Additionally, the court will not exclude evidence regarding # 14—Putz' "ding bat" comments to Bradley (Bradley 2/13/98 affidavit). It is not apparent that plaintiff was aware of these comments when the initial disclosures were filed. Finally, the court will not exclude evidence regarding behavior by Krantz, since Krantz was listed in the initial disclosure. This includes # 9 ("attractive outfit" comment), # 10 ("nice tits" comment to Bradley), and # 17 (Krantz on the table incident).

 In the Eleventh Circuit, dismissal of a claim as a discovery sanction is justified only in extreme circumstances. *See Wouters v. Martin County, Florida,* 9 F.3d 924 (11th Cir.1993). While the court does not here dismiss plaintiffs claims, it recognizes that its decision to exclude plaintiff's evidence—particularly that involving Colburn—has significantly diminished the viability of plaintiff's hostile environment and constructive discharge claims. In excluding this evidence, the court is mindful of the purposes of imposing sanctions (*see id.,* 9 F.3d at 933), and the fact that that "[d]ismissal is warranted only where noncompliance with discovery orders is due to willful or bad faith disregard for those orders." *Id.* (citing *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1556 (11th Cir.1986)).

Again, the court has previously determined after a hearing that plaintiff's failure to disclose information about Colburn was a deliberate, conscious choice on plaintiff's part. (*See* Order entered 6/30/99). This willful non-disclosure persisted through the time of the required initial disclosures, and was not remedied by plaintiff at any time prior to her deposition. The court is firmly of the conviction that plaintiff's failure to reveal the names of the alleged harassers was in bad faith, as evidenced by plaintiff's continued concealment of the basis of her claim even in the face of specific, detailed interrogatories.

At the time of plaintiff's deposition, defendant was facing an impending summary judgment deadline that had already been extended by the court. Plaintiff's belated disclosure was largely responsible for turning what should have been a relatively straightforward Title VII case into a procedural quagmire. The court cannot conclude that any sanction short of excluding evidence regarding the non-disclosed individuals[36] will adequately serve the purposes of penalizing plaintiff for her willful disregard of her obligations, or of deterring others from engaging in similar conduct.

Again, many of the individuals now named as harassers were not disclosed at all until January 6–7, only several days before defendant's motion for summary judgment was due. To "put things right" as to defendant would require allowing defendant to re-depose plaintiff with the benefit of proper preparation and allowing defendant an opportunity to re-file its summary judgment motion.[37] Defendant has already briefed this motion to the tune of 166 pages.[38] Thus, this remedy, even if accompanied by a monetary sanction, would work a substantial hardship on defendant. The court concludes that this case presents an exceptional circumstance warranting an extreme sanction, and that lesser sanctions would not suffice.

### Objectively "Severe and Pervasive"

"Although Title VII's prohibition of sex discrimination clearly includes sexual harass-

---

**35.** Plaintiff testified that she complained to Colburn about Runo Anderson's "cute little waist" comment. (Burney depo., pp. 191–193).

**36.** The court has generously interpreted plaintiff's initial disclosure in this regard.

**37.** Defendant's summary judgment brief does not address much of the evidence disclosed in the final days of plaintiff's deposition.

**38.** This figure excludes any briefing on the motion to strike plaintiff's amended complaint, which was converted into a motion for partial summary judgment, and the motion in limine directed to sanctions for the plaintiff's non-disclosure.

ment, Title VII is not a federal 'civility code.'" *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)(*en banc*) (citations omitted). "Sexual harassment constitutes sex discrimination only when the harassment alters the terms or conditions of employment." *Id.*; *see also Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)("To constitute an actionable hostile environment, conduct must be objectively sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.")(quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). In *Mendoza, supra*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367 .... The employee must "subjectively perceive" the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable. *Id.* The environment must be one that "a reasonable person would find hostile or abusive" and that "the victim ... subjectively perceive[s] to be abusive." *Id.* at 21, 114 S.Ct. 367 .... Furthermore, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale [v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201] at 1003 (quoting *Harris*, 510 U.S. at 23, 114 S.Ct. 367).

The objective component of this analysis is somewhat fact intensive. Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir.1997)(citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367). The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (citations omitted).

■■■ Defendant argues that plaintiff cannot establish that the alleged harassment was objectively sufficiently severe or pervasive to establish an actionable hostile environment.[39] The following evidence relied on by plaintiff has survived the imposition of sanctions:

> she conducted herself inappropriately at a Rheem promotional event at Talladega Superspeedway in July 1996 (becoming intoxicated, cursing, taunting a group of intoxicated strangers by suggesting she would expose her breasts to them, and passing out on Rheem's bus); that a Rheem employee observed plaintiff driving while she was apparently intoxicated; and that she routinely dated Rheem employees and discussed her personal life with her coworkers. Plaintiff has disputed this evidence. In view of the court's conclusion that plaintiff has not established a genuine issue of material fact regarding whether the work environment was objectively hostile, the court will not reach defendant's argument regarding whether plaintiff subjectively perceived the environment as hostile.

---

**39.** Defendant also argues that "the undisputed evidence clearly shows that Plaintiff voluntarily participated in or exposed herself to most, if not all, forms of behavior she now claims were harassment in order to gather evidence for a suit against Rheem" and, thus, she "cannot show the environment was subjectively hostile." (Defendant's Brief, p. 76). If an employee "does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation." *Harris v. Forklift Systems, Inc.*, 510 U.S. at 21–22, 114 S.Ct. 367. Defendant has submitted evidence that plaintiff was gathering evidence for a lawsuit in which she hoped to obtain "millions" of dollars from defendant and keeping a list of incidents which involved inappropriate workplace conduct; that

(1) the cartoon facsimile incident in 1993;

(2) the "Krantz and gals" comment by Farwell in 1994;

(3) the "watch you girls" comment by Putz in 1994;

(4) Krantz' complimenting plaintiff's outfit in a demeaning tone while staring at her "behind";

(5) Runo Anderson's comment to plaintiff "early on" about her "cute little waist";

(6) the Krantz/Martin incident in which Krantz climbed on a table on all fours and raised his leg toward Martin's face;

(7) the Banker/McKenzie "balls" comments;

(8) the Krantz–to–Bradley "nice tits" comment;

(9) the Putz–to–Bradley "ding bat" comments;

(10) Blanz' "if you looked like" McKenzie/Pecot comment;

(11) Runo Anderson's "Mfg Expectations" chart;

(12) comments to Kuhlman regarding PMS;

(13) Kuhlman's "export administrator" title;

(14) Kuhlman's receipt of "breast enlargement clinic" ad;

(15) Spencer's adjusting his insulin pump;

(16) Hanning's touching Kuhlman's neck/shoulders;

(17) Putz–to–Kuhlman bra comments;

(18) Whittington's complaints regarding Anderson;

(19) rumors circulated about plaintiff (Talladega, intoxication, Colburn affair, bad job at a trade show);

(20) Milt Roberts shoulder-rubbing incident; and

(21) the Kristen Carter duct taping incident.

As to four of the items listed above, plaintiff has not directed the court to any evidence sufficient to create an issue of fact regarding whether she was aware of the incidents at any time during her employment with Rheem. If plaintiff was not aware of them, they could not have affected her view of the environment. *See Edwards v. Wallace Community College*, 49 F.3d 1517, 1522 (11th Cir.1995)("[S]ome of the incidents relied upon were not made known to Edwards until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment."). Thus, on plaintiffs' hostile environment and constructive discharge claims, the court will not consider: Kuhlman's complaints to Billingsley regarding jokes about her having PMS; Krantz' "nice tits" comment to Bradley;[40] Putz' "ding bat" comments to Bradley;[41] and Putz' comments to Kuhlman regarding whether she was wearing a bra.[42]

Of the remaining instances of harassment set forth above, eight concern things that did not happen to plaintiff or in her presence, and they do not have any apparent connection with plaintiff other than that they occurred at her workplace. Since there is evidence that she learned of them during her employment (or, at least, evidence sufficient to permit such an inference), the court will

---

**40.** In her brief, plaintiff cites Bradley's affidavit as evidence of this incident. Bradley's affidavit does not indicate that she advised plaintiff of the comment. (*See* Bradley aff., ¶ 3). Plaintiff also cites her own deposition testimony at page 588. The court notes that plaintiff also testified about this incident earlier at pages 140–42. While this testimony makes clear that plaintiff was aware of the comment at the time of her deposition, it does not suggest that plaintiff was aware of the comment during her employment. (Burney depo., p. 588; *see also* p. 140–42).

**41.** Bradley's affidavit states that Putz would "often openly call me 'ding bat' around the office." (Bradley aff., ¶ 8). Bradley left Rheem "some-time in 1993." *Id.*, ¶ 1. Burney started her employment with Rheem in 1993. (Burney aff., ¶ 2). This evidence is insufficient to permit an inference that Burney overheard one of these comments.

**42.** Kuhlman testified that plaintiff "could have heard" such comments, since Putz sometimes made them in the hallway. (Kuhlman depo., p. 200). Plaintiff argues that she was "in fact directly exposed to these comments;" but she has cited no evidence to support this assertion. (Plaintiff's surreply brief, p. 22). It is not reasonable to infer from Kuhlman's testimony that plaintiff actually heard such comments.

consider them in conjunction with the remaining incidents in evaluating plaintiff's claims. However, as to these incidents, the effect on plaintiff's environment is somewhat attenuated: the Krantz "table" incident; the Runo Anderson "Mfg. Expectations" presentation; Kuhlman's "export administrator" title; Kuhlman's receipt of the "breast enlargement clinic" ad; Spencer's adjustment of his insulin pump; Hanning's touching Kuhlman's neck and shoulders; the Whittington/Anderson affair; and the Kristen Carter incident. The last two of these concern events that occurred before plaintiff was even employed by Rheem and, thus, the impact of these events on the "hostility" of her working environment cannot have been significant. The incidents which plaintiff actually witnessed or experienced are: the cartoon facsimile incident, Farwell's "Krantz and gals" comment; Putz' "watch you girls" comment; Anderson's "cute little waist" comment, Banker's statements to McKenzie about handling his "balls," the Blanz "if you looked like" McKenzie/Pecof comment to plaintiff, the Milt Roberts incident, and the rumors which circulated about plaintiff near the end of her employment.

█ Plaintiff was employed by Rheem from mid-January 1993 until September 1996. (Burney aff., ¶ 2; Plaintiff's Exhibits 34, D). The events supporting plaintiffs hostile environment claim occurred at various times over a period of three and a half years. Applying the *Harris* factors to the totality of these events, the court concludes that plaintiff has not established a genuine issue of material fact regarding whether the conduct at issue is objectively sufficiently severe or pervasive to alter the terms and conditions of her employment.[43] Of the incidents under consideration, only one—the incident in which Kristen Carter's hands were duct-taped behind her back—is physically threatening or humiliating. Again, however, this

happened to Carter, not to plaintiff. Further, it occurred before plaintiff was employed by Rheem. Plaintiff was physically touched only once, by Milt Roberts when he put his arm around her and rubbed her shoulder. Many of the remaining incidents involve merely offensive comments, some of them only marginally so. There is some evidence that the remaining incidents interfered with plaintiff's job performance, but only in that plaintiff told Blanz she could no longer work with the individuals who had spread false rumors about her. (Defendant's Exhibit L). In her affidavit, plaintiff states, "I performed the components of my job successfully and received numerous compliments frequently about my excellent work performance and letters of commendation from customers, co-workers, and vendors throughout my tenure at Rheem." (Burney aff., ¶ 4). Spread over a period of three and a half years, the incidents remaining in evidence in support of plaintiff's claims are not particularly frequent. However, "to the extent [plaintiff] showed frequent conduct, the frequency of it does not compensate for the absence of the other factors." *Mendoza*, 195 F.3d at 1248. Upon evaluation of the totality of the circumstances in view of the *Harris* factors, the court cannot conclude that the conduct at issue was objectively sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment. Thus, defendant is entitled to summary judgment on plaintiffs hostile environment claim.

## Constructive Discharge

█ "[W]hen an employee involuntarily resigns in order to escape intolerable and illegal employment requirements to which he or she is subjected because of race, color, religion, sex, or national origin, the employer has committed a constructive discharge in violation of Title VII." *Henson v. City of*

---

**43.** Plaintiff's testimony regarding the cartoon facsimile does not reveal who sent the facsimile. (*See* Burney depo., pp. 187–89). It is questionable whether her employer may be held accountable for this incident. Additionally, while Spencer's act in adjusting his insulin pump may have been indiscreet, it is not apparent that it had "a sexual or other gender-related connotation." *See Mendoza*, 195 F.3d at 1247–48. The same is true

regarding the rumors that circulated about plaintiff at the end of her tenure—for instance, the rumor that plaintiff was having an affair with Colburn was circulated about Colburn, as well as the plaintiff. The court need not decide these issues, however, because it determines that even when these incidents are included in the analysis, plaintiff has not created an issue of fact regarding objective severity or pervasiveness.

**698**

*Dundee,* 682 F.2d 897, 907 (11th Cir.1982) (quoting *Young v. Southwestern Savings & Loan Ass'n,* 509 F.2d 140, 144 (5th Cir.1975)(internal quotation marks omitted)). "In order to prove constructive discharge, an employee 'must demonstrate that [her] working conditions were so intolerable that a reasonable person in [her] position would be compelled to resign.'" *Graham v. State Farm Mutual Insurance Company,* 193 F.3d 1274, 1284 (11th Cir.1999)(quoting *Morgan v. Ford,* 6 F.3d 750, 755 (11th Cir.1993)).

The evidence which survived imposition of sanctions does not create a genuine issue of fact regarding whether plaintiff's working conditions were so intolerable as to have caused a reasonable person to be compelled to resign. Thus, defendant is entitled to summary judgment on plaintiff's constructive discharge claim.

### CONCLUSION

For the foregoing reasons, it is

ORDERED that defendant's motion for summary judgment is DENIED as to plaintiff's claim that defendant discriminated against her when it failed to select her for the position of International Sales Manager. In all other respects, the motion is GRANTED.

It is further ORDERED that defendant is DIRECTED to file, on or before February 22, 2000, either an affidavit or declaration under penalty of perjury from Scott Martin adopting his statement filed in support of this motion (Defendant's Exhibit 15).